*Execution Version*

**SHARED SERVICES SYSTEMS AGREEMENT**

by and between

LIMETREE BAY TERMINALS, LLC,

and

LIMETREE BAY REFINING, LLC,

and acknowledged by,

LIMETREE BAY REFINING MARKETING, LLC

Dated as of November 30, 2018

**Exhibit 1**
Confidential

# CONTENTS

**Section**      **Page**

ARTICLE 1 DEFINITIONS AND INTERPRETATION ................................................................2

    1.1    Certain Definitions ................................................................................2
    1.2    Construction; Interpretation ................................................................8

ARTICLE 2 USE OF SHARED SERVICES SYSTEMS ................................................................9

    2.1    Use of Shared Services Systems ................................................................9
    2.2    Authorizations................................................................................10
    2.3    Conveyance of Rights; Real Estate Matters................................................10
    2.4    Additional Shared Services Systems; Additional Interconnection ......................12
    2.5    Installation of Attached Separate Facilities ................................................13

ARTICLE 3 OPERATION AND MAINTENANCE OF SHARED SERVICES SYSTEMS ...............................................................................15

    3.1    Operation and Maintenance of Shared Services Systems ................................15
    3.2    Warranty Claims ................................................................................15
    3.3    Alteration or Removal of Shared Services Systems ......................................15
    3.4    Access to the Shared Services Systems and Facilities..................................15
    3.5    Limitations on Activities Not Expressly Permitted under this Agreement...........17

ARTICLE 4 SHARED SERVICES SYSTEMS MANAGEMENT ...........................................18

    4.1    Authority and Operation and Maintenance Obligations of Primary Party; Records ................................................................................18
    4.2    Limitation on Authority ................................................................19
    4.3    Prosecution of Claims by Primary Party; Limitation of Liability........................19
    4.4    Interference with the Secondary Party's Operation ......................................20

ARTICLE 5 SHARED AUTHORIZATIONS ................................................................20

    5.1    General................................................................................20
    5.2    Maintenance, Renewals and Extensions of Shared Authorizations......................20
    5.3    Compliance with Terms and Conditions of Shared Authorizations ....................21
    5.4    Modifications to Facilities or Equipment Covered by Shared Authorizations ................................................................................21
    5.5    Amendments or Modifications to Shared Authorizations ..................................21
    5.6    Transfer of Shared Authorizations to Primary Party ....................................22
    5.7    Step-In Rights with respect to Shared Authorizations ..................................22
    5.8    Records ................................................................................23
    5.9    Shared Authorizations Violations ................................................................23

ARTICLE 6 SHARED SERVICES................................................................................23

US-DOCS\101520926.60

**Exhibit 1**
Confidential

6.1    Shared Services.................................................................................23
6.2    Subcontracts; Use of Third Parties...................................................24
6.3    Maintenance of Office and Personnel...............................................24
6.4    Notices..............................................................................................25

ARTICLE 7 COVENANTS ........................................................................................25

7.1    Taxes.................................................................................................25
7.2    Compliance with Law.......................................................................25
7.3    Conduct of Activities........................................................................25
7.4    Financing Cooperation......................................................................26
7.5    Other Covenants................................................................................26
7.6    Liens..................................................................................................27

ARTICLE 8 INSURANCE..........................................................................................27

8.1    Coverages..........................................................................................27
8.2    Primary Coverage.............................................................................27
8.3    Additional Insured; Waiver of Subrogation......................................28

ARTICLE 9 TERM; DEFAULT AND REMEDIES......................................................28

9.1    Term..................................................................................................28
9.2    Events of Default..............................................................................28
9.3    Remedies...........................................................................................30

ARTICLE 10 PAYMENTS ..........................................................................................30

10.1   Invoicing; Late Payments.................................................................30

ARTICLE 11 REPRESENTATIONS AND WARRANTIES.......................................31

11.1   General..............................................................................................31
11.2   AS-IS, WHERE-IS............................................................................32
11.3   DISCLAIMER...................................................................................32

ARTICLE 12 INDEMNITIES; LIMITATION ON DAMAGES..................................32

12.1   Indemnity..........................................................................................32

ARTICLE 13 NOTICES..............................................................................................35

13.1   Notices..............................................................................................35

ARTICLE 14 MISCELLANEOUS.............................................................................37

14.1   Several Obligations; Relationship of Parties....................................37
14.2   Force Majeure...................................................................................37

US-DOCS\101520926.60

**Exhibit 1**
Confidential

14.3    Entire Agreement ........................................................................................38
14.4    Cooperation; Further Assurances.................................................................38
14.5    Captions .......................................................................................................38
14.6    Severability ..................................................................................................38
14.7    Parties in Interest; Assignment; Sale of Shared Services Systems .............38
14.8    Governing Law; Dispute Resolution ...........................................................40
14.9    Amendment ..................................................................................................43
14.10   Survival .......................................................................................................43
14.11   Waiver; Remedies ........................................................................................43
14.12   Confidentiality ............................................................................................43
14.13   Facsimile; Counterparts ..............................................................................44

EXHIBIT A        Shared Premises

EXHIBIT B        Description of Shared Services Systems, Shared Services, Shared Authorizations, and    Shared Expenses

EXHIBIT C        Memorandum of Shared Services Systems Agreement

EXHIBIT D        Undivided Interest Percentages

EXHIBIT E        Shared Expense Allocation Criteria

US-DOCS\101520926.60

**Exhibit 1**

Confidential

## SHARED SERVICES SYSTEMS AGREEMENT

This SHARED SERVICES SYSTEMS AGREEMENT (this "*Agreement*"), dated as of November 30, 2018, is entered into by and among: (a) LIMETREE BAY TERMINALS, LLC, a U.S. Virgin Islands limited liability company ("*LBT*"), and (b) LIMETREE BAY REFINING, LLC, a U.S. Virgin Islands limited liability company ("*LBR*"). LBT and LBR are sometimes hereinafter referred to individually as a "*Party*" and collectively as the "*Parties*."

## RECITALS

WHEREAS, the Government of the U.S. Virgin Islands (the "*Government*") and LBR have entered into that certain Refinery Operating Agreement, dated as of July 2, 2018 (the "*Refinery Operating Agreement*") pursuant to which LBR, as an inducement to maintain ownership of, develop, operate, and maintain the Refinery (as defined below) and related facilities, located at Limetree Bay, St. Croix, U.S. Virgin Islands, has been granted rights to conduct the business of the Refinery and related facilities;

WHEREAS, the Government and LBT have entered into that certain Amended and Restated Terminal Operating Agreement, dated as of July 2, 2018 (the "*Terminal Operating Agreement*") pursuant to which LBT, as an inducement to maintain ownership of, develop, operate, and maintain the Terminal (as defined below) and related facilities, located at Limetree Bay, St. Croix, U.S. Virgin Islands, has been granted rights to conduct the business of the Terminal and related facilities;

WHEREAS, each of LBR and LBT is (a) also holder of certain lease, easement, license and permit rights, all of which are more particularly described on Exhibit A (the "*Shared Premises Agreements*") to use certain real property and (b) the fee holder of real property, in each case, as more particularly described on Exhibit A (the "*Shared Premises*"). Each of LBR and LBT will require the use and possession of specified portions of the Shared Premises for the construction, operation and maintenance of its respective Facility;

WHEREAS, each of LBR and LBT owns certain personal property, fixtures, facilities, equipment, and other infrastructure assets (excluding real estate), all as further described on Part I of Exhibit B (the "*Shared Services Systems*") located on the Terminal Site, the Refinery Site or the Shared Premises, as applicable, and each Party will require the use and/or possession of the Shared Services Systems for the development, construction, ownership, operation and maintenance, as applicable, of its respective Facility;

WHEREAS, LBT is a party to that certain Shared Services, Utilities and Facilities Agreement, dated January 4, 2016 (the "*Hovensa Shared Services Agreement*"), between LBT and Hovensa L.L.C. ("*Hovensa*"), pursuant to which LBT provides Hovensa with services and access relating to the Shared Services Systems;

WHEREAS, each Party holds and maintains, in its own name (or together with, or through, the other Party), certain Authorizations (as defined below) that contemplate and will accommodate both Facilities, all as further described on Part II of Exhibit B (the "*Shared Authorizations*");

1

**Exhibit 1**
Confidential

WHEREAS, each Party will require certain management and administrative services for the re-development, construction, ownership, operation and maintenance, as applicable, its respective Facility (the "***Shared Services***", as defined below and more fully described in Exhibit E); and

WHEREAS, the Parties desire to set forth herein each Party's rights and obligations with respect to the Shared Services Systems, the Shared Authorizations and the Shared Services and the obligations of each Party to share the cost thereof.

## AGREEMENT

NOW, THEREFORE, in consideration of the agreements and covenants hereinafter set forth, and intending to be legally bound hereby, the Parties covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS AND INTERPRETATION

1.1 **Certain Definitions**.  As used in this Agreement, the following capitalized terms shall have the meanings set forth below:

"***AAA***" has the meaning set forth in Section 14.9.1.

"***Additional Shared Services Systems***" has the meaning set forth in Section 2.4(a).

"***Affiliate***" means, when used with reference to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with the specified Person.

"***Agreement***" has the meaning set forth in the Preamble.

"***Applicable Law***" means any present or future constitution, law, statute, ordinance, order, injunction, administrative and/or judicial order or decree, code, rule, regulation, or Authorization, or any amendments thereto, and any voluntary cleanup program and/or brownfields program of any Governmental Authority (excluding any such legislative, judicial or administrative body or instrumentality acting in any capacity as a lender, guarantor or mortgagee) applicable to a Party or its Affiliate or the subject matter of this Agreement.

"***Attaching Party***" has the meaning set forth in Section 2.5.1.

"***Attached Separate Facility***" has the meaning set forth in Section 2.5.1.

"***Authorizations***" means mean any licenses, certificates, permits, orders, approvals, consents, determinations, variances, franchises, entitlements, approvals or other authorizations from any Governmental Authority.

"***BP***" means BP Products North America, Inc., a corporation organized under the laws of Maryland.

US-DOCS\101520926.60

**Exhibit 1**
Confidential

"**Business Day**" means Monday through Friday of each week, except that a legal holiday recognized as such by the Government (including, for the avoidance of doubt, any administrative leave day granted by the Government for the entire U.S. Virgin Islands) shall not be regarded as a Business Day, and a "**Day**" shall be any calendar day.

"**Contaminant**" shall include but not be limited to any contaminant, air contaminant, solid or hazardous waste, hazardous material, infectious waste, waste, pollutant, air pollutant, hazardous air pollutant, regulated air pollutant, pollution, air pollution, radioactive material, hazardous or toxic substance, crude oil, any fraction thereof, petroleum product, petroleum byproduct, and or fuel additive, defined or regulated as such now or in the future in or under any Environmental Laws or voluntary cleanup or brownfields program.

"**Control**" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or member or partnership interests, by contract or otherwise.

"**CPI Adjustment**" means, with respect to any calculation of a payment herein that is expressly subject to an inflation adjustment, an adjustment upwards or downwards for inflation calculated by reference to the change in the final Consumer Price Index for All Urban Consumers U.S. City Average, All Items, not seasonally adjusted, as reported by the United States Department of Labor, Bureau of Labor Statistics, or any successor agency between the first date of measurement of the relevant period and the last date of measurement of the relevant period.

"**Default Rate**" means a rate of interest per annum equal to the lesser of: (a) a varying rate per annum equal to the sum of: (i) the prime rate as published in *The Wall Street Journal*, with adjustments in that varying rate to be made on the same date as any change in that rate is so published; *plus* (ii) two percent (2%) per annum; and (b) the maximum rate permitted by applicable Law.

"**Dispute**" has the meaning set forth in Section 14.9.1.

"**Effective Date**" means the date hereof.

"**Emergency**" means any sudden or unexpected event or circumstance (which shall include storms or other severe weather events) that (a) causes, or risks causing, damage to the Refinery or Terminal or other property or injury to any Person and (b) is of such a nature that responding to the event cannot, in the reasonable discretion of the Primary Party, await the decision or consent of the Secondary Party.

"**Environmental Action**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, consent order, consent decree, abatement order or other order or directive (conditional or otherwise) by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with Environmental Law or any actual or alleged violation of Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or

3

**Exhibit 1**
Confidential

alleged damage, injury, threat or harm from Hazardous Materials to human health, safety or the environment (including natural resources).

"*Environmental Laws*" shall mean any Applicable Law, Order or other requirement of Applicable Law (including environmental Authorizations and the including the Consent Decree, to the extent any Party becomes a party thereto) that relates to (a) the protection of human, plant or animal health or welfare or protection of the environment, including but not limited to threatened or endangered species, wetlands, ambient air, surface water, groundwater, land surface or subsurface strata, natural resources, natural resource damages, and the restoration and replacement of natural resources, including those legal requirements relating to any Hazardous Materials Activity or (b) the presence, Release, threatened Release, generation, recycling, disposal or treatment of Hazardous Materials, or the arrangement for any such activities.

 "*Event of Default*" has the meaning set forth in Section 9.2.

"*Facilities*" means, collectively, the Terminal and the Refinery and "Facility" means any of them, as the context may require.

"*Financing Documents*" means those documents governing a Party's relationship with a Financing Party.

"*Financing Party*" means, with respect to either Party, the agent, trustee or lead bank, or other lending institutions or other financial institutions, under any loan agreement, hedge agreement, or other financing instrument with, or any guarantee thereof by, such Party.

"*Force Majeure Event*" has the meaning set forth in Section 14.2.1.

"*Governmental Authority*" means any foreign, federal, territorial, state or local governmental entity, authority or agency, court, tribunal, regulatory commission or other body, whether legislative, judicial or executive (or a combination or permutation thereof) having jurisdiction as to the matter in question.

"*Hazardous Materials*" means (a) any petrochemical or petroleum products, oil, waste oil, asbestos in any form that is or could become friable, urea formaldehyde foam insulations, toxic mold, lead-based paint and polychlorinated biphenyls; (b) any products, mixtures, compounds, materials, wastes or substances, air emissions, toxic substances, wastewater discharges and any chemical, material, waste or substance that may give rise to liability pursuant to, or is listed or regulated under, or the human exposure to which or the Release of which is controlled or limited by Environmental Laws; and (c) any materials, wastes or substances defined in Environmental Laws as "hazardous," "toxic," "pollutant," or "contaminant," or words of similar meaning or regulatory effect.

"*Hazardous Materials Activity*" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the generation, use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any

4

**Exhibit 1**
Confidential

Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"*Hovensa*" has the meaning set forth in the Recitals.

"*Hovensa Shared Services Agreement*" has the meaning set forth in the Recitals.

"*Indemnitees*" with respect to either Party means such Party and such Party's officers, directors, managers, members, employees, agents, partners, shareholders, representatives, successors, and assigns.

"*Invoice*" has the meaning set forth in Section 10.1.3.

"*Land Matters*" means any and all covenants, conditions, restrictions, and other encumbrances affecting the applicable Refinery Site (as defined in the Refinery Operating Agreement), Terminal Site (as defined in the Terminal Operating Agreement) or other applicable real property and binding upon the owner, tenant, licensee, easement holder, or any other user or occupant of that real property.

"*LBRM*" means Limetree Bay Refining Marketing, LLC, a U.S. Virgin Islands limited liability company, a wholly-owned subsidiary of LBR.

"*Liabilities*" means any and all indebtedness, Taxes, liabilities and obligations, whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured, or determined or determinable.

"*Major Event*" means a restart, refurbishment or upgrade to, descoping, retirement, shutdown, or construction of personal property, fixtures, facilities, equipment, and other infrastructure assets with respect to either the Refinery or the Terminal, in each case, that results in a material change to the Shared Services Systems, Shared Services, Shared Authorizations and/or Shared Premises contemplated by (1) Exhibits A, B, D and E of this Agreement and the Operating Agreements as of the date hereof and/or (2) the definition of Refinery Restart (as defined in the Tolling Agreement) and/or Annex 2 of the Tolling Agreement.

"*Order*" means any judgment, order, injunction, decree, writ, permit, or license issued or entered by or with any Governmental Authority or any arbitrator, whether preliminary, interlocutory, or final.

"*Operating Agreement*" means the Terminal Operating Agreement or Refinery Operating Agreement, as applicable.

"*Party*" has the meaning set forth in the Preamble.

"*Person*" means an individual, a partnership, a limited partnership, a limited liability partnership, a limited liability limited partnership, a joint venture, a joint stock company, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group, any governmental entity or any other form of entity or organization.

US-DOCS\101520926.60

**Exhibit 1**
Confidential

"***Primary Party***" means, for any given Shared Services System, Shared Authorization or Shared Service, the Primary Party listed on Exhibit B.

"***Primary Party Permittees***" means the Primary Party and Primary Party's employees, tenants, invitees, licensees, contractors, subcontractors, consultants, and guests, other than Secondary Party Permittees.

"***Provider***" means, for any given Shared Service, the Provider listed on Exhibit E, or, if the Provider defaults under Section 9.2 and the other Party elects to become the Provider pursuant to Section 9.3, such other Party.

"***Prudent Industry Practice***" means those practices, methods, equipment, specifications, and standards of manufacture, care, skill, safety, performance, dependability, efficiency, economy and diligence, as the same may change from time to time, as are commonly used and generally recognized in respect of the design, development, construction, maintenance, financing and operation of components of terminal and refining facilities of comparable type and complexity and having geographical and physical attributes similar to the Facilities and the Shared Services Systems that, in the exercise of reasonable judgment and in light of the facts known at the time the decision was made, are considered prudent practice and would be intended to accomplish the result intended at a reasonable cost and consistent with Applicable Laws, reliability, safety and expedition. "Prudent Industry Practice" does not necessarily mean the best practice, method, or standard of care, skill, safety, and diligence in all cases, but is instead intended to encompass a range of acceptable practices, methods, and standards.

"***Real Estate Assets***" means, at any time of determination, any fee or leasehold interest, easement, consent, permit or license, then owned or held by either Party in any real property.

"***Recipient***" means, for any given Shared Service, the Party that is not listed as the Provider on Exhibit E, or, if the initial Provider defaults under Section 9.2 and the Recipient elects to become the Provider pursuant to Section 9.3, the initial Provider.

"***Refinery***" has the meaning given to such term in the Refinery Operating Agreement.

"***Refinery Operating Agreement***" has the meaning assigned to such term in the recitals.

"***Refinery Site***" has the meaning given to such term in the Refinery Operating Agreement.

"***Release***" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"***Secondary Party***" means, for any given Shared Services System, Shared Authorization or Shared Service, the Secondary Party listed on Exhibit B.

6

Exhibit 1

Confidential

"**Secondary Party Permittees**" means the Secondary Party and the Secondary Party's employees, tenants, invitees, licensees, contractors, subcontractors, consultants, and guests, other than Primary Party Permittees.

"**Share**" means, for each calendar month the percentage allocation to each Party of Shared Expenses for such calendar month, as determined by the Primary Party in accordance with the allocation criteria specified in Exhibit E and as may be objected to by the Secondary Party pursuant to the dispute resolution provisions in Section 14.8; provided, that during any such dispute, the percentage allocation for the preceding calendar month shall govern. For the avoidance of doubt, each Party's "Share" may vary on a calendar month-by-month basis and the "Share" for Shared Services Systems, Shared Services and Shared Authorizations within any calendar month may vary on a case-by-case basis.

"**Shared Authorization Holder**" has the meaning set forth in Section 5.1.

"**Shared Authorizations**" has the meaning set forth in the Recitals.

"**Shared Authorizations Transfer**" has the meaning set forth in Section 5.6.

"**Shared Expenses**" means all actual, arms'-length costs, expenses, and Liabilities (excluding any fee or markup) incurred by Primary Party (or Secondary Party, to the extent the Primary Party has designated the obligation for operation and maintenance to the Secondary Party in accordance with Sections 3.1 and 6.2 and Secondary Party has accepted such designation) in connection with such Party's duties and obligations in connection with the Shared Services Systems, Shared Services and Shared Authorizations, including:

(a)     the salaries, wages, and related indirect and overhead costs properly allocable to the Shared Services Systems, Shared Services, or Shared Authorizations for such Party's personnel who perform the duties and obligations of such Party pursuant to this Agreement;

(b)     all Taxes and Assessments properly allocable to the Shared Services Systems;

(c)     all indirect and direct out-of-pocket expenses incurred by such Party in performing its obligations hereunder pertaining to the Shared Services Systems, Shared Services, or Shared Authorizations either pursuant to a direct invoice delivered by such Party in accordance with Section 10 or as a reimbursement of such expenses and liabilities advanced by such Party and invoiced in accordance with the terms of Section 10, except for any such out-of-pocket expenses incurred by such Party as a result of such Party's gross negligence or willful misconduct in the performance of such Party's obligations hereunder; and

(d)     all other Liabilities that such Party incurs in connection with the ownership, operation, maintenance, repair, or construction of the Shared Services Systems, except for any such Liabilities incurred by such Party as a result of such Party's gross negligence or willful misconduct in the performance of such Party's obligations hereunder.

US-DOCS\101520926.60

Exhibit 1
Confidential

"**_Shared Services_**" has the meaning set forth in Section 6.1.

"**_Shared Services Systems_**" has the meaning set forth in the Recitals.

"**_Shared Services Systems Site_**" has the meaning set forth in Section 3.5(b).

"**_Shared Premises_**" has the meaning set forth in the recitals.

"**_Shared Premises Agreements_**" has the meaning set forth in the recitals.

"**_Site_**" has the meaning given to such term in the Refinery Operating Agreement.

"**_Taxes and Assessments_**" has the meaning set forth in Section 7.1.

"**_Term_**" has the meaning set forth in Section 9.1.

"**_Terminal_**" has the meaning given to such term in the Terminal Operating Agreement.

 "**_Terminal Operating Agreement_**" has the meaning assigned to such term in the recitals.

"**_Terminal Site_**" has the meaning given to such term in the Terminal Operating Agreement.

"**_Tolling Agreement_**" means that certain Tolling Agreement, dated as of the date hereof, by and among LBR, LBRM and BP.

1.2     **Construction; Interpretation**.   Except where expressly provided or unless the context otherwise necessarily requires, in this Agreement: (a) reference to a given Article, Section, clause, Schedule, or Exhibit is a reference to an Article, Section, or clause of, or Schedule or Exhibit to, this Agreement, unless otherwise specified; (b) the terms "hereof," "herein," "hereunder," and "herewith" refer to this Agreement as a whole; (c) unless otherwise specifically indicated or to the extent that the context otherwise requires: (i) all references to "$" mean United States dollars; (ii) words importing the singular shall include the plural and vice versa; (iii) words importing any gender shall include all genders; (iv) all references to "days" means calendar days; (v) "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; and (vi) all words used as accounting terms shall have the meanings assigned to them under generally accepted accounting principles applied on a consistent basis and as amended from time to time; (d) if any date on which any action is required to be taken hereunder by any of the Parties hereto is not a Business Day, then such action shall be required to be taken on the next succeeding Business Day; (e) except as otherwise expressly set forth herein, reference to a given agreement, instrument, document, or law is a reference to that agreement, instrument, document or law as modified, amended, supplemented, and restated; (f) reference to a Person includes its predecessors, successors, and permitted assigns; (g) any reference to any federal, state, local, or foreign law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise; (h) the word "will" shall be construed to have the same meaning and effect as the word "shall" and the word "or" shall not be exclusive; (i) amounts calculated or determined under this Agreement shall be without double-counting; (j) no provision of this Agreement will be

8

**Exhibit 1**
Confidential

interpreted in favor of, or against, either of the Parties to this Agreement by reason of the extent to which any such Party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft of this Agreement, and no rule of strict construction will be applied against either Party; (k) no Person will be required to take any action, or fail to take any action, if to do so would violate any law; and (l) the definition of "Primary Party" and "Secondary Party" is for drafting convenience only, and the Secondary Party shall have the rights and remedies specified under this Agreement and such definition shall not indicate that the Secondary Party's rights specified under this Agreement are subordinated to, or diminished, impaired or preempted by the Primary Party.

## ARTICLE 2
## USE OF SHARED SERVICES SYSTEMS

**2.1**   **Use of Shared Services Systems**.

2.1.1   <u>Use of Shared Services Systems by the Secondary Party</u>.  Except to the extent otherwise agreed to in writing by the Parties, the Secondary Party may use and share in the use of the Shared Services Systems, but shall use or share in the use of the Shared Services Systems only: (a) in connection with the Secondary Party's operation and ownership of its Facility; and (b) in accordance with the terms hereof.

2.1.2   <u>General</u>.  Subject to the terms hereof, in constructing, installing, operating, using, and maintaining its Facility and otherwise in using the Shared Services Systems in connection with the operation and ownership of its Facility, each Party shall:

(a)      generally cooperate in good faith to accommodate the other Party's reasonable permitted use of the Shared Services Systems;

(b)      make all reasonable efforts to coordinate construction, installation, operation, maintenance, and other activities related to its Facility with the other Party so as to minimize interference with the other Party's use of the Shared Services Systems:

(c)      comply with any written safety and operating requirements of Primary Party when performing work that may impact the Shared Services Systems; and

(d)      otherwise conduct such activities so as not to unreasonably interfere with the other Party's use of the Shared Services Systems or the construction, operation, maintenance retirement, discontinuation of permanent operations, decommissioning, demolishing, or use of the other Party's Facility.

2.1.3   <u>No Material and Adverse Use of Shared Services Systems</u>.  Neither Party shall, without the consent of the other Party, use, or permit the use of, the Shared Services Systems in any manner that could reasonably be expected to materially and adversely affect the other Party's operation, maintenance and repair of its Facility or access to, or operation, maintenance and repair of, the Shared Services Systems.

9

**Exhibit 1**
Confidential

2.2   **Authorizations**.  Except for Shared Authorizations, each Party shall be solely responsible for obtaining and maintaining all Authorizations necessary to permit such Party's construction, installation, operation, and maintenance of its Facility and its access to and use of the Shared Services Systems.  Each Party shall, from time to time, upon the request from time to time of the other Party, provide to the other Party copies of all Authorizations that are related to the ownership and operation of the providing Party's Facility and/or the Shared Service Systems held by such providing Party.

2.3   **Conveyance of Rights; Real Estate Matters**.

(a)   Each Party shall be solely responsible for obtaining and maintaining all third-party real property rights necessary to permit such Party's construction, installation, operation, and maintenance of its Facility and its access to and use of the Shared Services Systems.  Each Party, upon the request from time to time of the other Party, shall provide to such other Party evidence of such rights.

(b)   As of (i) the date hereof and (ii) on any other date that Shared Services Systems are added to this Agreement pursuant to Section 2.4 or 2.5 below, the Party that owns such Shared Services Systems shall GRANT, SELL, TRANSFER, ASSIGN, and CONVEY unto the other Party an undivided ownership interest in and to such Shared Services Systems owned or hereafter acquired by the transferring Party and subject to such request, in each case in the proportion specified in Exhibit D hereto, **AS IS, WITH ALL FAULTS AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EITHER EXPRESS OR IMPLIED, AND SPECIFICALLY EXCLUDING ANY WARRANTY OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER WARRANTY ARISING UNDER STATUTORY OR COMMON LAW**, while at the same time reserving to itself an undivided ownership interest in and to such Shared Services Systems in the amount of its proportion specified in Exhibit D hereto.  In accepting an undivided interest in the Shared Services Systems as set forth in this Agreement, each Party will accept the Shared Services Systems subject to (a) all Applicable Law and governmental approvals governing or regulating the ownership, occupancy, use, design, construction, maintenance or operation of the Shared Services Systems and (b) all covenants, conditions, reservations, restrictions, easements, liens, encumbrances and other matters (including all matters of record) affecting the Shared Services Systems.  Without limiting the generality of the foregoing, the foregoing assignment shall include the joint use of those certain Shared Services Systems located on or under the Shared Premises (whether now existing or hereafter constructed), to the extent such Shared Services Systems (whether now existing or hereafter constructed) constitute fixtures under Applicable Law. The transferring Party shall deliver a bill of sale to the transferee Party with respect to any such undivided ownership interest in and to the Shared Services Systems so granted, sold, transferred, assigned and conveyed, and the consideration paid by the transferee Party in respect thereof shall be the consideration specified in the Operating Agreements or, if not specified therein, for $1.  The intent of the foregoing is that each Party shall own an undivided tenancy in common interest in

10

Exhibit 1
Confidential

each of the applicable Shared Services Systems in the proportion specified in Exhibit D hereto so as to provide for the joint ownership of the Shared Services Systems by the Parties subject to the terms and conditions of this Agreement. The proportion specified in Exhibit D shall not be subject to change in connection with any modification of a Party's Share in accordance with the provisions of this Agreement. The Parties may from time to time after the date hereof, by mutual agreement as contemplated by the Operating Agreements, further transfer and convey from one Party to the other Party, Shared Services Systems, Shared Premises and Shared Authorizations, and the relevant exhibits to this Agreements shall be updated appropriately.

(c)     Each Party shall comply with all the terms and conditions of the Shared Premises Agreements, the Land Matters, and approvals of Governmental Authorities. Any amounts due under the terms of the Shared Premises Agreements shall be paid by Primary Party, subject to reimbursement by the Secondary Party in accordance with Article 10. No Shared Premises Agreement may be terminated, modified or amended without the consent of each Party, unless such modification or amendment of a Shared Premises Agreement is necessary for the continued operation and maintenance of the Shared Services Systems as currently installed or would not materially and adversely impact the operation and maintenance of the Shared Service Systems or the other Party's Facility. In the case of any such modification or amendment of a Shared Premises Agreement, the Party making such modification or amendment shall promptly notify the other Party of such modification or amendment and shall provide copies of the modified or amended Shared Premises Agreement. Nevertheless, if either Party wishes to terminate its interest in a Shared Premises Agreement, and such termination (i) is permitted by the Shared Premises Agreement itself or by the counterparty thereto and (ii) will have no adverse effect on the other Party thereto, then such Party may terminate its interest in that Shared Premises Agreement. The permitted termination by a Party of its interest in a Shared Premises Agreement shall not cause or be deemed to cause the release of such Party from any liabilities or obligations accruing prior to such termination.

(d)     Concurrently with the execution and delivery of this Agreement, the Parties will execute a Memorandum of this Agreement in the form of Exhibit C, which Memorandum will be recorded in the official real estate records of the jurisdiction in which the Shared Services Systems are located. The provisions of this Agreement will control, however, with regard to any omissions from, or provisions of this Agreement that may be in conflict with, the Memorandum of Agreement. The Memorandum of Agreement may be updated from time to time as the Parties deem appropriate. At such time as this Agreement has been terminated, the Parties agree to execute and record in the official real estate records of the counties referred to above, a termination of the Memorandum of Agreement, which termination will specifically refer to the Memorandum of Agreement and will recite that this Agreement has terminated in accordance with the provisions of this Agreement.

US-DOCS\101520926.60

Exhibit 1
Confidential

(e)     The covenants, terms, conditions and restrictions of this Agreement shall be binding upon, and inure to the benefit of the Parties and shall continue as a servitude running with each of the Terminal Site and Refinery Site.

**2.4    Additional Shared Services Systems; Additional Interconnection**.

(a)     To the extent that a Party determines that any additional personal property, fixtures, facilities, equipment and other infrastructure assets (excluding real estate) ("***Additional Shared Services Systems***") that relate to the Facilities or the Shared Services Systems or operation thereof, are required or would materially benefit, in the reasonable belief of such Party, one or more Facilities, such Party may give written notice to the other Party of such determination, with a reasonable explanation of why such Additional Shared Services Systems are needed.  The Party receiving such notice shall have thirty (30) days after receiving such notice to determine if such Additional Shared Services Systems are also needed or desirable for its Facility and to so notify the other Party in writing of its election to participate in the acquisition, installation, and/or construction of such Additional Shared Services Systems.  A Party's failure to notify the other Party of its election to participate within such thirty (30) days period will be deemed an election to decline to participate in the addition of the proposed Additional Shared Services Systems to the Shared Services Systems.  Any Additional Shared Services Systems that the Parties agree to add to the Shared Services Systems to be governed by this Agreement shall be (a) procured by the Party requesting the addition of the Additional Shared Services Systems, (b) added to the Shared Services Systems under this Agreement, including by operation of Section 2.3(b) above, and (c) held in undivided ownership interests by the Parties, in proportion with each such Parties' relative Share (as determined based on projected use pursuant to this Agreement) to be governed by the terms of this Agreement.  If the Parties do not agree to add Additional Shared Services Systems requested by a Party, then the requesting Party may develop, construct or acquire the additional premises or facilities needed by and to be held by such Party not as part of the Shared Services Systems hereunder, and not subject to the terms of this Agreement, provided that any additional facilities so developed, constructed or acquired comply with Section 2.4(b).

(b)     The (x) installation of Additional Shared Services Systems, (y) connection of a Facility to the Shared Services Systems and/or (z) the developing, constructing, acquiring the additional premises or facilities needed by and to be held by a Party not as part of the Shared Services Systems hereunder shall (i) not interfere with the use, or access by the other Party of the then-existing Shared Services Systems, except as may be necessary during the installation, repair, or replacement of Shared Services Systems, (ii) to the extent commercially reasonable, schedule during an off-peak period any required disconnection or shut down of the Shared Services Systems and conduct construction activities to minimize the impact on the Shared Services Systems and the Facilities of the other Party, (iii) provide at least ninety (90) days' prior written notice of commencement of such construction activities together with a reasonably detailed description thereof, (iv) provide at least ninety

US-DOCS\101520926.60

**Exhibit 1**
Confidential

(90) days' prior written notice of any planned outages, and the durations thereof, of the Shared Services Systems that would result in a disconnection or shut down of, or material commercial impact upon, the other Facility not owned by such Party, (v) take into consideration, to the extent commercially reasonable, any changes in the construction plans or timing of construction required by the other Party, provided that the other Party does not attempt to interfere with the installation of the proposed Additional Shared Services Systems, unless such installation can reasonably be expected to result in an Emergency or violate the terms of the Shared Premises Agreements, Authorizations, or this Agreement, (vi) be responsible for obtaining and complying with any necessary Authorizations and providing documentary evidence of such Authorizations to the Primary Party and Secondary Party, (vii) compensate the other Party's Facilities for lost revenues due to an outage or disconnection of such Party's Facilities resulting from such installation and (viii) not otherwise materially and adversely affect the other Party's operation, maintenance and repair of its Facility or access to, or operation, maintenance and repair of, the Shared Services Systems. The Party installing Additional Shared Services Systems that are not needed by or would not benefit the other Party, or connecting its own Facility to the Shared Services Systems, shall indemnify, defend and hold harmless the other non-participating Party from all Liabilities, including third party claims, property and revenue losses incurred, as a result of such construction or installation activities, to the extent such claims and damages are not covered by the insurance required by Section 8.  Installation of Additional Shared Services Systems that the non-requesting Party elected to participate in shall be installed jointly by the Parties or by the Primary Party at the direction of the Secondary Party and will be at the risk of both of the Parties, and each Party shall have the right to review and approve all design, planning and installation elements in connection with such installation, and will bear any risk of loss thereof in proportion with its Share in the Additional Shared Services Systems.

**2.5**    **Installation of Attached Separate Facilities**.

2.5.1    <u>General</u>.    Subject to the restrictions in <u>Section 5.4</u> pertaining to Shared Authorizations, any Party (the "***Attaching Party***") may attach, install or interconnect separate facilities onto any Shared Services Systems (or replace any such separate facilities attached or installed onto, or interconnected with, any Shared Services Systems) (each such separate facility for an Attaching Party, an "***Attached Separate Facility***") to the extent that such Attached Separate Facilities: (a) are required in connection with the construction, operation, maintenance or use of that Attaching Party's Facility; and (b) are attached, installed or interconnected in a manner that complies with the conditions set forth in Section 2.4(b)(i) through (viii) (taking into account any additional compensation paid by the Attaching Party to the other Party in accordance with Section 2.5.2 and the indemnification specified in Section 2.5.3).  For the avoidance of doubt, the Attached Separate Facilities, themselves and alone, are not part of, and are separate from, the Shared Services Systems.

2.5.2    <u>Procedure</u>.

13

**Exhibit 1**
Confidential

(a)    If a Party proposes to attach, install, interconnect or replace an Attached Separate Facility to the Shared Services Systems, then such Party shall provide to the other Party for its review, no later than thirty (30) days before the proposed commencement of such attachment, installation, interconnection or replacement:

(i)    a detailed preliminary design for such attachment, installation, interconnection or replacement;

(ii)    a detailed execution plan for such attachment, installation, interconnection or replacement; and

(iii)    a good faith schedule for the commencement and completion of such attachment, installation, interconnection or replacement work.

(b)    A Party may attach, install, interconnect or replace any Attached Separate Facility to the Shared Services Systems so long as the conditions set forth in Section 2.5.1 are satisfied.

(c)    Any such attachment, installation, interconnection or replacement work with respect to any Attached Separate Facility to the Shared Services Systems: (x) shall be at the sole cost and expense of the Party requesting such attachment, installation, interconnection or replacement work (including, as applicable, compensation to the other Party for any outage and/or to address any material adverse impact specified in Section 2.5.1(b)); and (y) to the extent Section 2.5.1(b) has not been satisfied, shall not be undertaken without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed. The Parties shall use commercially reasonable efforts to minimize any outages of the Shared Services Systems that are required in connection with such attachment, installation, interconnection or replacement work, and to the extent any such outages are required, each Party shall use commercially reasonable efforts to cause such outages to occur, to the extent practicable, during hours that minimize the economic impact to the Parties of such outages.

2.5.3    Indemnification. Each Attaching Party agrees to indemnify and hold harmless the Indemnitees of the other Party from and against all Liabilities incurred or suffered by such Indemnitees as a result of any interference with the operation of such other Party's Facility that is caused by the installation, maintenance, operation, or repair of any Attached Separate Facility; provided that no Attaching Party shall have any obligation to indemnify the Indemnitees of the other Party in connection with the installation, maintenance, operation, or repair of such Attaching Party's Attached Separate Facilities to the extent any such Liabilities are caused by the negligence, fraud, or willful misconduct of the Indemnitees of such other Party.

US-DOCS\101520926.60

Exhibit 1
Confidential

**ARTICLE 3**
**OPERATION AND MAINTENANCE OF SHARED SERVICES SYSTEMS**

3.1    **Operation and Maintenance of Shared Services Systems**.  During the term of this Agreement, the Primary Party shall be solely responsible for operating and maintaining (or providing for the operation and maintenance of) its Shared Services Systems in accordance with Section 4.1, which operation and maintenance shall include repair and replacement of the components of the Shared Services Systems and maintenance of access ways.  All such operation and maintenance services of the Primary Party may be performed on behalf of the Primary Party by one or more Persons or contractors, and the Primary Party may subcontract or revocably designate in writing the obligation for operation and maintenance to a Secondary Party in accordance with Section 6.2 to the extent accepted by the Secondary Party in writing.

3.2    **Warranty Claims**.  The Primary Party shall use its good-faith discretion (taking into account the impact on itself and the Secondary Party) in determining whether to exercise any rights under any contractor or vendor warranties, performance guarantees or contracts for operation or maintenance or other rights applicable to its Shared Services Systems. The Primary Party shall be responsible for administering the prosecution of any warranty claim relating to its Shared Services Systems, and the Secondary Party shall cooperate with the Primary Party with respect to such warranty claims to the extent necessary or reasonably requested.  All expenses incurred by the Primary Party in pursuing such warranty claims shall be allocated to each Party in accordance with its Share.  The Primary Party may subcontract or revocably assign or designate, in writing, its obligations under this Section 3.2 to the Secondary Party, or to any subsidiary of the Secondary Party, in accordance with Section 6.2 to the extent accepted by the Secondary Party in writing.

3.3    **Alteration or Removal of Shared Services Systems**.  Neither Party shall remove, replace, or materially alter any portion of the Shared Services Systems without (a) first providing the other Party at least ninety (90) days prior written notice (or such shorter time as may be reasonably required under the circumstances) and (b) the prior written consent of the other Party (not to be unreasonably withheld, conditioned or delayed); provided, that the foregoing shall not restrict any removal, replacement or material alteration of the Shared Service Systems that are necessary in connection with the Primary Party's operation and maintenance of the Shared Services Systems or so long as the Primary Party's use of, or share in the use of, the Shared Services Systems could not reasonably be expected to materially and adversely affect the other Party's operation, maintenance and repair of its Facility or access to, or operation, maintenance and repair of, the Shared Services Systems.

3.4    **Access to the Shared Services Systems and Facilities**.

(a)    The Primary Party reserves, on behalf of itself and its respective agents, representatives, advisors, consultants and contractors, and any person acting on its behalf pursuant to Section 3.1, and shall continue to have, complete and unrestricted access to its Shared Services Systems at all times.  The Secondary Party (including its respective agents, representatives, advisors, consultants and contractors) shall

15

Exhibit 1
Confidential

have access to the Shared Services Systems, subject to complying with Applicable Laws and the Shared Authorizations, and only to the extent necessary:

(i)     to use, or share in the use of, such Shared Services Systems in connection with the use, maintenance, or operation of the Secondary Party's Facility, but only: (1) in the manner in which such Shared Services Systems are permitted and intended to be used as set forth in this Agreement; and (2) to the extent such Shared Services Systems are identified on Exhibit B as Shared Services Systems to which the Secondary Party has access;

(ii)    to maintain the Shared Services Systems, but only to the extent: (1) the Primary Party has failed to comply with its maintenance obligations hereunder within the time frames permitted by this Agreement (including in the event that the Operating Agreement to which the Primary Party is a party has been terminated or its rights thereunder suspended or assigned); (2) the Secondary Party has notified the Primary Party and the Secondary Party of such failure in writing and has provided the Primary Party with reasonable time (not to be less than ten (10) days) to cure such failure after such notice; and (3) Primary Party fails to cure such failure within such reasonable time period;

(iii)   to maintain or repair the Shared Services Systems in the event of an Emergency, but only to the extent the Primary Party fails to respond timely to such Emergency; and

(iv)    to the extent the Secondary Party has been designated as the operator or subcontractor of a Shared Services System in accordance with Section 3.1 and 6.2.

(b)     In the case of Section 3.4(a)(ii) above, the non-performing Party shall pay all reasonable costs and expenses incurred by the other Party (to the extent that such other Party would not have been required under the terms of this Agreement to bear or otherwise reimburse the non-performing Party for its incurrence of such costs had it performed as required hereunder) promptly upon receipt of an invoice for such costs and expenses accompanied by documentation evidencing such costs and expenses. Either Party may exercise its rights under Section 3.4(a)(ii) without first obtaining relief under any dispute resolution proceeding relating to the failure to perform any such obligations; provided, however, that such Party shall not be entitled to reimbursement for any exercise of its rights under the last sentence of Section 3.4(a)(ii) unless and until it has been determined pursuant to the dispute resolution procedures of this Agreement that the purportedly non-performing Party has actually breached such obligations hereunder with respect to the Shared Services Systems.

(c)     Notwithstanding this Section 3.4, the Secondary Party shall give the Primary Party prior notice of its intent to access the Shared Services Systems to perform work as permitted by this Section 3.4 (except in the event of an Emergency (to the extent

US-DOCS\101520926.60

Exhibit 1
Confidential

the Secondary Party is permitted such access hereunder), in which case the Secondary Party shall deliver notice of its entry as promptly as practicable thereafter), and the Secondary Party shall follow all written safety and security procedures adopted by the Primary Party with respect to the Shared Services Systems and provided by the Primary Party to the Secondary Party in writing.

(d)     Each of LBT and LBR (including their respective agents, representatives, advisors, consultants and contractors) shall have access to the Refinery Site and the Terminal Site, respectively, subject to (i) providing prior notice of such need for access, (ii) compliance with the reasonable safety rules and policies of the other Party, (iii) compliance with the Operating Agreements, Applicable Laws and the Shared Authorizations and (iv) as may be reasonably necessary in connection with the operation and maintenance of such Party's Facility.

(e)     Effective as of the date hereof, (i) LBR grants to LBT a non-exclusive access and easement on, over, under and across the Refinery Site and the applicable Shared Premises owned by LBR and (ii) LBT grants to LBR a non-exclusive access and easement on, over, under and across the Terminal Site and the applicable Shared Premises owned by LBT, in either case, (1) only to the extent necessary for such non-granting Party to exercise its rights specified in this Section 3.4 and as otherwise specified in this Agreement, (2) subject to the non-granting Party providing the granting Party with reasonable prior notice (except in the case of Emergency) and (3) the non-granting Party complying with the reasonable safety rules and policies of the granting Party, the Operating Agreements, Applicable Laws, Shared Authorizations, and this Agreement.  The grantee of any such easement agrees to comply with any underlying real property right or other agreement, covenant, condition or restriction applicable to the real property upon which such easement is granted.

**3.5     Limitations on Activities Not Expressly Permitted under this Agreement**.  Except: (1) as required by Applicable Laws; (2) as required by the Terminal Operating Agreement (in the case of LBT) or the Refinery Operating Agreement (in the case of LBR); (3) to the extent the Secondary Party is designated as an operator by the Primary Party pursuant to Section 3.1 or (4) as expressly permitted under this Agreement, the Secondary Party shall not, without the prior written consent of Primary Party:

(a)     use, maintain, construct, install, alter, improve, or remove any of the Shared Services Systems in any manner;

(b)     conduct or perform any activity or operation on the portion of the Facilities on which the Shared Services Systems (the "*Shared Services Systems Site*") are located unless such activity or operation is necessary for the Secondary Party: (i) to operate, use, maintain, repair, retire, discontinue operation of, decommission, or demolish its Facility; <u>provided</u> that the Secondary Party notifies the Primary Party in writing, to the extent practicable, no later than ten (10) Business Days before conducting or performing any of the aforesaid activities or operations and the Primary Party declines to undertake such activity or operation; or (ii) to exercise its

US-DOCS\101520926.60

**Exhibit 1**
Confidential

rights or perform its obligations hereunder, including with respect to any applicable Authorization;

(c)      grant to any third party any lease, license, or permit to use the Shared Services Systems; or

(d)      grant to any third party any easement, right-of-way, servitude or other interest or estate in the Shared Services Systems Site or any lien, encumbrance, covenant or restriction on the Shared Services Systems Site.

For the avoidance of doubt, the foregoing shall only restrict the rights of the Secondary Party and shall not restrict the rights of the Primary Party as specified in this Agreement.

## ARTICLE 4
## SHARED SERVICES SYSTEMS MANAGEMENT

**4.1**    <u>**Authority and Operation and Maintenance Obligations of Primary Party; Records**</u>. Subject to Section 4.2, the Primary Party shall, and shall be authorized to, perform the following activities on behalf of the Secondary Party:

(a)      The Primary Party shall use its good-faith, commercially reasonable efforts to maintain (or provide and enforce a contract with a third party for the maintenance of) its Shared Services Systems in accordance with Prudent Industry Practice, the Operating Agreements, the Hovensa Shared Services Agreement, Applicable Laws, Shared Authorizations, and this Agreement.

(b)      The Primary Party shall maintain books and records related to the operation and maintenance of its Shared Services Systems and shall make such books and records available to the Secondary Party and, so long as the Tolling Agreement is in effect, BP upon the reasonable request of the Secondary Party and, so long as the Tolling Agreement is in effect, BP during the Primary Party's regular business hours; provided that the Secondary Party and, so long as the Tolling Agreement is in effect, BP shall only have the right to inspect and audit such books and records for any period that is within two (2) calendar years from the date an applicable payment is made hereunder or the final settlement or disposition of any claim made pursuant to this Agreement. If any such audit or inspection discloses an error and that, as a result thereof, an overpayment or underpayment has occurred hereunder, the amount thereof shall be paid within thirty (30) days after receipt of an invoice (with reasonable supporting detail) with interest (except that any underpayment caused by the actions of the Primary Party will not bear interest) at the Default Rate to the Party to whom it is owed by the other Party obligated therefor; provided that a Party shall only be liable for any amounts hereunder that relate to errors discovered and disclosed within the inspection and audit period provided for in this provision.

(c)      The Primary Party shall procure and maintain policies of insurance for its Shared Services Systems in accordance with Section 8.1.

US-DOCS\101520926.60

**Exhibit 1**
Confidential

(d)      The Primary Party shall, upon the request of the Secondary Party and, so long as the Tolling Agreement is in effect, BP, promptly provide to the Secondary Party and, so long as the Tolling Agreement is in effect, BP a reasonably detailed statement of the amounts payable or reimbursable by the Secondary Party pursuant to Section 10.1.2.

The Secondary Party and BP shall not participate or interfere in any way in the management of the Shared Services Systems or the Shared Services Systems Site except as expressly provided in this Agreement.

4.2      **Limitation on Authority**.  The Primary Party shall not, without the prior written consent of the Secondary Party:

(a)      perform or omit to perform any act, which performance or omission would cause any Person to reasonably believe that the Primary Party is a partner of the Secondary Party or authorized to bind the Secondary Party, except as expressly provided herein;

(b)      except as expressly set forth herein, make any repairs or perform any maintenance on the Secondary Party's Facility; or

(c)      sell, encumber or otherwise dispose of all or any material portion of the Shared Services Systems or the Shared Services Systems Site to the extent such sale, encumbrance or disposition could reasonably be expected to have a material adverse effect on the use of the Shared Services Systems by the Secondary Party as permitted hereunder.  For the avoidance of doubt, any (x) encumbrance of the Shared Services Systems or the Shared Services Systems Site that is subject to the terms of a non-disturbance and attornment agreement reasonably acceptable to and entered into by the Secondary Party or (y) change of control transaction as set forth in and permitted by either Operating Agreement shall not be in violation of this clause (c).

4.3      **Prosecution of Claims by Primary Party; Limitation of Liability**.  The Primary Party shall, to the extent commercially and reasonably practical (taking into account the impact on itself and the Secondary Party), use its good-faith efforts to:

(a)      prosecute warranty claims in accordance with the provisions of Section 3.2; and

(b)      prosecute indemnities and other payments to which it may be entitled under any contractual arrangement.

The Primary Party shall use its good-faith efforts to apportion recoveries from such prosecution of remedies *first* to repair or replace the Shared Services Systems as may be required by Prudent Industry Practice; and *second* between the Primary Party and the Secondary Party in accordance with their pro rata share of losses related to the event or breach to which such recovery is related.  As such, the Primary Party shall not be liable to the Secondary Party in connection with warranties, indemnitees, and other similar payments from warranty providers beyond the obligation to pursue such warranties,

US-DOCS\101520926.60

Exhibit 1
Confidential

indemnitees, and other similar payments, and to apportion recoveries to the Secondary Party, in each case in accordance with Section 10.1. The Secondary Party waives and covenants not to (1) directly prosecute any warranty claims without the consent of the Primary Party (not to be unreasonably withheld, conditioned or delayed) and (2) bring any claims against the Primary Party in connection with warranties, indemnitees, and other similar payments from warranty providers, even if gross negligence, fraud, or willful misconduct by such warranty providers is alleged.

4.4    **Interference with the Secondary Party's Operation**. Notwithstanding any other provision in this Agreement to the contrary, except in the case of an Emergency, and subject to any requirements in the Shared Authorizations for the Secondary Party to cease operation of its Facility or any portions thereof, the Primary Party shall not take any action under this Agreement that could reasonably be expected to materially impair the Secondary Party's operation, maintenance, or repair of its Facility, except to the extent the Primary Party is permitted to do so in the exercise of Primary Party's remedies under Article 9 or pursuant to Articles 2 or 3.

## ARTICLE 5
## SHARED AUTHORIZATIONS

5.1    **General**. To the extent permitted by Applicable Law, it is agreed that each Party shall have the right to share in the use and benefit of, and exercise the rights under, the Shared Authorizations to the extent required or useful for purposes of the construction, commissioning, operation, and maintenance of the Shared Services Systems and their respective Facilities. In furtherance of the foregoing, each Party shall construct, commission, operate, and maintain its respective Facility and the Shared Services Systems and conduct its business in all respects in accordance with the terms and conditions set forth in the Shared Authorizations that are applicable thereto. Each Party shall cooperate and work together with the other Party in good faith in order to effectuate the foregoing and concerning all interaction with Governmental Authorities concerning the Shared Authorizations. The Party to which a Shared Authorization has been issued or assigned is referred to herein as the "***Shared Authorization Holder***."

5.2    **Maintenance, Renewals and Extensions of Shared Authorizations**. Each Party shall be responsible for maintaining, renewing, and extending the Shared Authorizations for which it is the Shared Authorization Holder and for all matters related thereto, including all communications with Governmental Authorities, the filing of any applications or requests, and the payment of any fees; provided that: (a) each Party shall reimburse the other Party for a portion of direct costs incurred in connection with the forgoing, including the payment of any fees required by a Governmental Authority, in proportion to such Party's Share of the Shared Expenses; and (b) each Party shall be responsible for providing to each other Party promptly upon request any information pertaining to its Facility that is reasonably required for maintaining, complying with, renewing, and extending the Shared Authorizations. Unless otherwise notified in writing by each other Party, the Shared Authorization Holder shall make timely requests to extend or renew the Shared Authorizations for which it is the Shared Authorization Holder to the full extent permitted by Applicable Laws regardless of whether such Shared Authorization is required for the

20

Exhibit 1
Confidential

continued operation of its Facility.  In the event that a Shared Authorization is scheduled to expire and no extension has been granted by the responsible Governmental Authority or is available under Applicable Law, then the Shared Authorization Holder shall notify each other Party of such circumstances in writing no later than thirty (30) Days prior to the scheduled expiration date or deadline for initiating the renewal of such Shared Authorization, whichever date is earlier.

5.3     **Compliance with Terms and Conditions of Shared Authorizations**.  Each Party shall be responsible for complying with the terms and conditions of the Shared Authorizations that are applicable to the Shared Services Systems and such Party's Facility, including the inspection, monitoring, coordination of air emissions testing, maintenance of effluent or emissions limits, record keeping, and reporting necessary to ensure compliance with the Shared Authorizations.  The Shared Authorization Holder shall be responsible for the payment of any fees required to be paid by a Governmental Authority in connection with the Shared Authorizations for which it is the Shared Authorization Holder (including any fees incurred under Section 5.2) and the preparation and submission of all notices, reports, requests, and other documentation in connection therewith; provided that: (a) each Party shall reimburse the other Party for a portion of such fees and direct costs incurred in the preparation and submission of all notices, reports, requests, and other documentation in connection therewith in proportion to such Party's Share of the Shared Expenses; and (b) each Party shall be responsible for providing to the other Party promptly upon request any information pertaining to its Facility that is reasonably required for the preparation of any such documentation.  Each Party shall consult with each other Party on all matters relating to the Shared Authorizations and each Shared Authorization Holder shall obtain the written consent of each other Party prior to submitting any correspondence or other documents regarding the Shared Authorizations to any Governmental Authority or other third party, which consent shall not be unreasonably withheld, delayed, or conditioned.

5.4     **Modifications to Facilities or Equipment Covered by Shared Authorizations**.  Except in case of Emergency, no Party shall (i) modify any facilities or equipment covered by the Shared Authorizations in any material respect, nor (ii) take any other action that would result in a material change in the method of operation of such facilities or equipment to the extent that (i) or (ii) would result in a violation of Applicable Law or require any adverse modification, amendment, or change to any Shared Authorization pursuant to Environmental Law without the prior written consent of the each other Party, which consent shall not be unreasonably withheld, delayed, or conditioned.

5.5     **Amendments or Modifications to Shared Authorizations**.

(a)     Subject to any conditions set forth in either Party's Financing Documents or the Operating Agreements, and except as set forth in this Section 5.5 and Section 5.6 no Party shall transfer, amend, or modify, or submit any application to any Governmental Authority to transfer, amend, or modify, the Shared Authorizations without the prior written consent of each other Party; unless such amendment or modification (x) affects only the Facility owned by the Party seeking such amendment or modification, and (y) does not otherwise adversely impact in any respect the other Party's rights to and interests under the Shared Authorizations.

21

**Exhibit 1**
Confidential

(b)    At the request of the Primary Party, the Secondary Party shall submit any applications and other supporting documents and information necessary to amend or modify any aspect of the Shared Authorizations for which the Secondary Party is the Shared Authorization Holder that pertain to the Primary Party's Facility or the Shared Services Systems.

(c)    Each Shared Authorization Holder shall be responsible at its sole expense for preparing any applications and supporting documents and information, and paying any applicable permitting fees and any other costs and expenses incurred in connection with any such request to amend or modify the Shared Authorizations held by such Shared Authorization Holder and may, after payment of such expenses, seek reimbursement from the other Parties based on their Share in accordance with Section 10.

(d)    Each amended or modified Shared Authorization in accordance with this Section 5.5 shall promptly be submitted to the other Party.

**5.6**    <u>**Transfer of Shared Authorizations to Primary Party**</u>.  Promptly after the written request of Primary Party, and to the extent permitted by Applicable Law, Secondary Party shall, at Primary Party's sole cost and expense and following Primary Party's review and approval of any filing: (a) promptly submit any applications, notices, requests for amendments, agreements, or other documents and information that may be required or requested by any Governmental Authority in order to transfer any Shared Authorizations for which the Secondary Party is the Shared Authorization Holder from the Secondary Party to the Primary Party, change the owner/operator identified in such Shared Authorizations from the Secondary Party to the Primary Party, re-issue such Shared Authorizations to the Primary Party, or implement whatever other process may be required by Applicable Laws or any Governmental Authority for the Primary Party to replace the Secondary Party as the holder of such Shared Authorizations ("***Shared Authorizations Transfer***"); and (b) subject to Section 9.2, use commercially reasonable efforts to cause such Shared Authorizations Transfer to occur as soon as practicable, but in no event later than the date that is one (1) year after the date on which the Primary Party requests such Shared Authorizations Transfer.  The obligations of the Secondary Party under this Section 5.6 shall survive the termination or expiration of this Agreement.

**5.7**    <u>**Step-In Rights with respect to Shared Authorizations**</u>.  Each Party agrees that if either Party fails to perform its obligations with respect to the Shared Authorizations hereunder, the other Party may, at its option and with reasonable advance notice to the non-performing Party, perform such obligations on behalf of the non-performing Party, but only to the extent: (i) the Primary Party has failed to comply with its maintenance obligations hereunder within the time frames permitted by this Agreement; (ii) the Secondary Party has notified the Primary Party and the Secondary Party of such failure in writing and has provided the Primary Party with reasonable time (not to be less than ten (10) days) to cure such failure after such notice; and (iii) Primary Party fails to cure such failure within such reasonable time period.  The non-performing Party shall pay all reasonable costs and expenses incurred by the other Party (to the extent that such other Party would not have been required under the terms of this Agreement to bear or otherwise reimburse the non-

US-DOCS\101520926.60

**Exhibit 1**
Confidential

performing Party for its incurrence of such costs had it performed as required hereunder) promptly upon receipt of an invoice for such costs and expenses accompanied by documentation evidencing such costs and expenses.  Either Party may exercise its rights under this Section 5.7 without first obtaining relief under any dispute resolution proceeding relating to the failure to perform any such obligations; <u>provided</u>, <u>however</u>, that such Party shall not be entitled to reimbursement for any exercise of its rights under the last sentence of this Section 5.7 unless and until it has been determined pursuant to the dispute resolution procedures of this Agreement that the purportedly non-performing Party has actually breached such obligations hereunder with respect to the Shared Authorizations.

**5.8**    **Records**.  Each Party shall maintain a true and correct set of records pertaining to all of its activities relating to the Shared Authorizations and its performance of this Agreement and all transactions related thereto.  Each Party further agrees to retain all such records for a period of not less than two (2) years after the termination of this Agreement or such longer period as required by Applicable Laws.  Either Party and, so long as the Tolling Agreement is in effect, BP may inspect any and all such records of the other Party and/or Parties, as applicable, from time to time upon reasonable prior notice to such Parties, and subject to reasonable safety and confidentiality requirements, for the purpose of determining compliance with the terms and conditions of this Agreement.

**5.9**    **Shared Authorizations Violations**.  The Parties shall reasonably cooperate with each other in connection with any investigation, defense, or mitigation in connection with any claim regarding a violation of the terms and conditions of the Shared Authorizations.  Each Party shall be responsible for any Liabilities related to any violation or alleged violation of any Shared Authorization to the extent that any such Liabilities are caused by, or otherwise are the result of, the failure of such Party to comply with the requirements of this Agreement or any Shared Authorization.

## ARTICLE 6
## SHARED SERVICES

**6.1**    **Shared Services**.

(a)    Subject to the terms of this Agreement, from and after the Effective Date and throughout the term of this Agreement, the Provider shall perform, or cause to be performed, on behalf of the Recipient, the management and administrative services described in Exhibit E in accordance with Prudent Industry Practice and the Operating Agreements, and such other services as the Recipient may reasonably request and the Provider may reasonably agree (collectively, the "***Shared Services***"), as such Services may be reviewed and updated from time to time by the Parties in writing.

(b)    If either Party wishes to add a new Shared Service not included in Exhibit E or otherwise suspended under Exhibit E that relate to the Facilities or the Shared Services Systems or operation thereof, are required or would materially benefit, in the reasonable belief of such Party, one or more Facilities, such Party may give written notice to the other Party of such determination, with a reasonable

US-DOCS\101520926.60

Exhibit 1
Confidential

explanation of why such additional Shared Services are needed. The Party receiving such notice shall have thirty (30) days after receiving such notice to determine if such additional Shared Services are also needed or desirable for its Facility and to so notify the other Party in writing of its election to participate in such additional Shared Services. A Party's failure to notify the other Party of its election to participate within such thirty (30) day period will be deemed an election to decline to participate in the addition of the proposed additional Shared Services. If the receiving Party agrees to participate in such additional Shared Service, the Parties shall negotiate in good faith to agree upon a reasonable cost allocation methodology for such Shared Service with preference given to allocation based the following (in order) (i) usage, (ii) time and materials costs of providing the applicable service, and (iii) other reasonable methodologies consistently applied. In the case of any resumption of service of any Shared Service included in Exhibit E that was subsequently suspended or terminated, upon request by the other Party, each Party hereto agrees that it will use commercially reasonable efforts to cause the resumption of such Shared Service (in accordance with, in the absence of a Major Event, the allocation criteria for Shared Expenses described in Exhibit E) and that such party shall not unreasonably withhold, condition or delay its consent to the resumption of such Shared Service.

(c)    The Recipient may send a written notice to the Provider that it no longer wishes to participate in a Shared Service after a period of no less than 30 days from the written notice, in which case the Provider shall send a final invoice to the Recipient in accordance with this Agreement and any such service shall no longer be a Shared Service hereunder.

**6.2**    **Subcontracts; Use of Third Parties**.  The Primary Party may subcontract with qualified subcontractors, including Affiliates of the Primary Party and/or the Secondary Party or its subsidiaries, for such routine or non-routine work as is necessary, in Primary Party's sole discretion, to perform the Shared Services pursuant to this Agreement. Subcontracting shall not relieve the Primary Party from its duties hereunder and all costs related to such subcontracts, including any out of pocket costs and expenses and any other compensation payable to the subcontractors shall be paid to the subcontractor by the Primary Party and not by the Secondary Party; provided, that the Secondary Party shall pay the Shared Expenses for which it is responsible whether the Shared Services are performed by the Primary Party or by any subcontractors, in accordance with the terms and subject to the conditions of this Agreement related to the payment for Shared Services. In the performance of the Shared Services, the Primary Party shall be authorized to use outside accounting, tax, investment banking, third party advisory and legal resources on behalf of the Secondary Party. The costs of retaining such outside accounting, tax, investment banking, third party advisory and legal resources shall be billed to and paid by the Secondary Party in accordance with this Article 6.

**6.3**    **Maintenance of Office and Personnel**.  The Primary Party shall maintain (directly or indirectly through its permitted subcontractors under Section 6.2), during the term of this Agreement, sufficient office space, equipment, supplies and personnel (underlined provided, that nothing herein shall require the Primary Party to retain, or restrict the Primary Party from

Exhibit 1
Confidential

terminating the employment of, any particular employee (or any other person engaged in the provision of the Shared Services), or to maintain any specific number of employees engaged in the provision of the Shared Services hereunder) for the performance of the Shared Services both at the Facility and at the Primary Party's business offices located elsewhere.

6.4    **Notices**.  Upon obtaining actual knowledge thereof, the Primary Party shall submit prompt notice to the Secondary Party of: (a) any litigation or claims, disputes or actions, threatened or filed, concerning the Secondary Party, or the Shared Services, or any facts based on which any of these are likely to arise; (b) any lapse, modification, termination or expiration of any governmental approval issued or obtained for the Primary Party, Secondary Party or Facilities or in connection with the Shared Services; (c) any refusal by any Person to grant, renew or extend any such governmental approval; and (d) any dispute with any Governmental Authority or with any other Person, with respect to the operation of the Facilities or the performance of the Shared Services.

**ARTICLE 7**
**COVENANTS**

7.1    **Taxes**.  Subject to the Operating Agreements, Primary Party shall pay, when due, all real and personal property taxes and assessments, general or special, and payments under the Operating Agreements, levied against or in connection with the Shared Services Systems and/or operations pursuant to this Agreement and any other user fee, tax, levy or impost which could give rise to a lien on Shared Services Systems or Shared Service System Site ("***Taxes and Assessments***"), subject to its right to contest by appropriate legal proceedings the validity or applicability of any such Taxes and Assessments.  To the extent any Taxes and Assessments are based on the value of, or are attributable to, the Shared Services Systems and any other property collectively, Primary Party shall allocate such Taxes and Assessments between the Shared Services Systems and the other property in a fair and equitable manner.  The Secondary Party shall reimburse the Primary Party for the same, as a Shared Expense, based on the Secondary Party's Share.

7.2    **Compliance with Law**.  Each Party shall, at its sole cost and expense (but subject to Primary Party's right to reimbursement from the Secondary Party for Shared Expenses or Shared Services Charges and the Secondary Party's right to reimbursement from the Primary Party with respect to the Shared Authorizations) promptly comply in all material respects with all Applicable Laws, the Operating Agreements and with all covenants, conditions, and restrictions in effect during the term of this Agreement or any part thereof regulating the use of the Shared Services Systems or Shared Services.

7.3    **Conduct of Activities**.  Each Party shall use its good-faith efforts to:

(a)    conduct its operations and activities with respect to its Facility in accordance with Prudent Industry Practices, its Operating Agreement and, in the case of LBT, the Hovensa Shared Services Agreement; and

25

**Exhibit 1**
Confidential

(b) keep its Facility in good condition and repair, in good and efficient working order, in each case to the extent the failure to do so could materially and adversely affect the Shared Services Systems or the Facility of the other Party.

No Party shall conduct its operations or activities, or use or permit the use of the Shared Services Systems Site, or any part thereof, in any manner that will (i) damage in any material respect such lands, or any part thereof or (ii) result in a material violation of a Shared Authorization.

**7.4** **Financing Cooperation**. Each Party, upon the reasonable request of the other Party and at the requesting Party's sole cost and expense shall:

(a) cooperate reasonably in the financing or refinancing of the other Party's Facility, including the execution of reasonable and customary estoppels and consents for the benefit of the Financing Parties of the other Party, and other similar commercially reasonable agreements as may be reasonably requested by the other Party and its Financing Parties;

(b) cooperate reasonably in the making of any filings required by: (i) the other Party for regulatory compliance; or (ii) any Governmental Authority;

(c) upon the request of the other Party, (i) cause its lenders (or an agent on their behalf) to sign a subordination agreement in form and substance acceptable to such Party and its Financing Parties and (ii) comply with Section 14.7.4(b); and

(d) to the extent reasonably requested by the other Party, re-survey and re-plot the Terminal Site (in the case of LBT) or the Refinery Site (in the case of LBR) in a manner to convey the real estate or interests in the real estate relating to the Facility of the other Party only.

**7.5** **Other Covenants**. Each Party shall:

(a) provide the other Party with all material information in its possession, including Authorizations, agreements, data, notices, and documents pertaining to the Shared Services Systems, Shared Services, and the Shared Authorizations, that is requested by, and reasonably required for, such other Party to perform its obligations under this Agreement or to comply with its Financing Documents;

(b) examine all material documents submitted by the other Party and render any necessary decisions pertaining thereto promptly;

(c) promptly make material decisions required under this Agreement and respond to all reasonable requests from the other Party for approval (when required) hereunder; and

(d) except where the same are being disputed in good faith, promptly make all payments, and incur all expenditures required, in connection with the Shared

**Exhibit 1**
Confidential

Services Systems, Shared Services, and Shared Authorizations in accordance with this Agreement.

7.6   **Liens**.  The Primary Party and Secondary Party shall keep the Shared Services Systems and the Shared Services Systems Site free and clear of any and all liens and claims of liens for labor and services performed on, and materials, supplies, or equipment furnished in connection with, the ownership, installation, maintenance, repair, or use by the Secondary Party's Secondary Party Permittees.  The Party responsible for any such non-permitted lien shall be solely responsible, at its sole cost and expense, for satisfying or removing any such lien on the Shared Services Systems or the Shared Services Systems Site no later than the date that is ten (10) days after the date on which such Party first obtained knowledge of the existence of such lien (unless, solely in the case of (1) Primary Party and (2) Secondary Party if it has been appointed as a subcontractor of Primary Party in accordance with Section 6.2, such lien or other lien arises upon or in connection with the performance of work, but is not enforceable against the Shared Services Systems unless and until a subsequent non-payment or other event occurs, in which case such Party shall not be required to satisfy or remove such lien until such time as the lien would otherwise become enforceable against the Shared Services Systems or the Shared Services Systems Site).

## ARTICLE 8
## INSURANCE

8.1   **Coverages**.  Primary Party shall procure and maintain in effect at all times during the Term, such insurance policies and coverages for the Shared Services Systems from such insurance companies as may be required to comply with the Operating Agreements and Prudent Industry Practice.  Any such insurance policies may cover both the Shared Services Systems and any other Facility.  To the extent any such insurance policies cover property in addition to the Shared Services Systems and the use and operation of the Shared Services Systems, Primary Party shall allocate the costs of such insurance policies between the Shared Services Systems and such other property in a fair and equitable manner.

8.2   **Primary Coverage**.  Any commercial general liability policy or commercial excess liability policy obtained by Primary Party for the Shared Services Systems in accordance with Section 8.1 shall be primary as respects any Liabilities arising out of this Agreement, and insured hereunder, and any insurance carried by either Party shall be excess of and noncontributing with such insurance afforded by such commercial general liability policy or commercial excess liability policy.  Such commercial general liability policy and commercial excess liability policy shall provide for claims by one insured against another such that, except for the limits of insurance, such insurance shall apply separately to each insured against whom a claim is made or suit is brought.  All policies of a Party shall be written with insurers that the other Party, in its reasonable discretion, deem acceptable (such acceptance will not be unreasonably withheld or delayed).  All policies of a Party shall contain an endorsement that such Party's insurance policies shall be primary for claims arising out of their activities regardless of like coverages, if any, carried by the other Party.  No Party's liability under this Agreement is limited to the amount of insurance coverage required herein by virtue of this Article 8.

US-DOCS\101520926.60

**Exhibit 1**
Confidential

**8.3**     **Additional Insured; Waiver of Subrogation**.

     8.3.1     <u>Additional Insureds</u>.  Except where each Party is a "named insured" under the same insurance policies required herein, each Party, its parent company, each of their respective Affiliates, each of their respective officers, directors, employees, agents, representatives, successors and assigns, and (if requested) each of their Financing Parties shall be named as an additional insured, as applicable, on any commercial general liability insurance obtained pursuant to Section 8.1, and deliver insurance certificates reasonably acceptable to the other Party evidencing that insurance coverages are in compliance with this Agreement.

     8.3.2     <u>Waiver of Subrogation</u>.  Each policy of insurance maintained by a Party pursuant to Section 8.1, except workers compensation insurance (if any), shall contain a waiver of subrogation in favor of the other Party.

     8.3.3     <u>Contractor's Insurance Requirements</u>.  For the duration of this Agreement, any contractor or subcontractor performing work on the Shared Service Systems Site shall, at its sole cost and expense, procure and maintain liability insurance policies and coverages in an amount required under the applicable service agreements or, if not specified therein, as reasonably required by the Parties and consistent with Prudent Industry Practice.

     8.3.4     <u>Replacement</u>.  If any insurance required to be maintained by a party hereunder ceases to be available on commercially reasonable terms in the commercial insurance market, such Party shall provide written notice to the other Parties accompanied by a certificate from an independent insurance advisor of recognized national standing, certifying that such insurance is not available on commercially reasonable terms in the commercial insurance market for Facilities of similar type, geographic location and design.   Upon receipt of such notice, such Party shall use commercially reasonable efforts to obtain other insurance that would provide comparable protection against the risk to be insured, and the other Party shall not unreasonably withhold its consent to modify or waive such requirement.

### ARTICLE 9
### TERM; DEFAULT AND REMEDIES

**9.1**     **Term**.  The term of this Agreement (the "***Term***") shall commence on the Effective Date and shall continue in full force and effect until the earlier of:

     (a)     the date on which either Party terminates this Agreement in accordance with Section 9.3; or

     (b)     a date upon which the Parties mutually agree.

**9.2**     **Events of Default**.  A Party shall be in material default of its obligations under this Agreement upon the occurrence of one or more of the following (each, an "***Event of Default***"):

US-DOCS\101520926.60

Exhibit 1
Confidential

(a) any failure of such Party to pay any amounts in excess of $1,000,000 due under this Agreement, and such failure continues for more than fifteen (15) days following the other Party's notice to such Party of such non-payment;

(b) such Party shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against such Party seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it) that is being diligently contested by it in good faith, either such proceeding shall remain undismissed or unstayed for a period of ninety (90) days or any of the actions sought in such proceeding (including the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or any substantial part of its property) shall occur; or any Person shall take any corporate action to authorize any of the actions set forth above in this <u>clause (b)</u>;

(c) the operation of such Party's Facility shall have been abandoned for a period of at least ninety (90) consecutive days (it being acknowledged that a casualty event, event of eminent domain, a force majeure event, an outage, or any other event which is not caused by such Party shall be deemed to not be an "Event of Abandonment"); or

(d) any other breach, default, or failure of performance by such Party of any of its obligations, covenants, representations, or warranties hereunder which is not cured within thirty (30) days following notice of such breach, default, or failure to the non-performing Party from the other Party; <u>provided</u> that if such breach, default, or failure is not capable of being cured within such thirty (30) day period, then such Party shall have additional time as may be reasonably necessary to cure such breach, default, or failure not to exceed ninety (90) days in the aggregate.

If an Event of Default shall occur and be continuing, then the non-defaulting Party may pursue any remedies given hereunder or now or hereafter existing at law or in equity or otherwise, including: (A) the right to specific performance without being required to post a bond; (B) the step-in rights specified in Section 5.7 with respect to Shared Authorizations; (C) the right to cure any breach, default or Event of Default by performing such Primary Party's obligations under this Agreement (including accessing, using, operating and maintaining the Shared Services Systems to the extent necessary and appropriate for the continued operation of the non-defaulting Party's Facility, all at the cost and expense of the defaulting Party); and (D) the right of the Primary Party to revoke permanently the defaulting Secondary Party's rights under this Agreement (including, for the avoidance of doubt, the defaulting Party's right to use the Shared Services Systems or Shared Services), in any case with or without reentering or resuming possession of the Shared Services

29

Exhibit 1
Confidential

Systems Site or accessing the Shared Services Systems and with or without terminating this Agreement.

**9.3**    **Remedies**. Upon the occurrence of an Event of Default, the non-defaulting Party may, after due inquiry that an Event of Default has occurred and is continuing, exercise any and all rights and remedies which such non-defaulting Party might otherwise have at law or in equity (including the right to sue for damages or for specific performance); <u>provided</u> that no Party may terminate this Agreement, revoke a Party's rights under this Agreement, or suspend performance hereunder, except as set forth in Section 9.2 above. The Parties acknowledge and agree that each Party requires the Shared Services Systems to operate its respective Facility and that, as a result, damages may not be an adequate remedy for a breach of this Agreement. As such, each Party acknowledges and agrees that upon any breach of this Agreement by such Party, the other Party may seek the specific performance of the other Party hereunder, and the non-defaulting Party may elect to take over the defaulting Party's role as Provider, as applicable.

**ARTICLE 10**
**PAYMENTS**

**10.1**    **Invoicing; Late Payments**.

    10.1.1   <u>Shared Expenses; Incremental Costs</u>. Unless otherwise agreed by the Primary Party and the Secondary Party, the Secondary Party shall pay to the Primary Party the Secondary Party's respective Share of all Shared Expenses.

    10.1.2   <u>Reimbursements</u>. All payments, insurance proceeds, recoveries and other amounts received by the Primary Party on behalf of the Secondary Party in connection with the Facilities or the performance of the Shared Services, except as may be specifically directed by the Secondary Party, shall be deposited directly into a bank account of the Secondary Party designated by such Party in advance.

    10.1.3   <u>Invoices; Payment</u>. No later than (a) the fifteenth (15th) day of each calendar month of the Term, the Primary Party shall send the Secondary Party a determination of the "Share" as specified in the definition thereof and in accordance with Exhibit E and (b) the twentieth (20th) day of each calendar month of the Term, the Primary Party shall send a reasonably detailed invoice to the Secondary Party setting forth the Secondary Party's Share of the applicable Shared Expenses for the immediately preceding calendar month (each, an "***Invoice***"). Payment by the Secondary Party of the undisputed portion of its respective Invoice will be due and payable within ten (10) days after receipt by the Secondary Party of such Invoice, or the first Business Day following such day if such day is not a Business Day. Any undisputed payment that is delinquent shall bear interest at the Default Rate. The payment of interest unaccompanied by payment of the delinquent payment shall not excuse or cure any default or delay in such undisputed payment. In the event interest accrues on any undisputed payment that is delinquent, such Primary Party shall reflect such amount in each subsequent invoice.

30

**Exhibit 1**
Confidential

10.1.4 <u>True-Up Amounts</u>.  Within 90 days after the end of each six (6) month period (or partial period) ending on June 30 or December 31 after the Effective Date, the Secondary Party shall issue a true-up invoice to the Primary Party, which invoice will provide appropriate adjustments, if any, to reflect adjustments to the Shared Expenses paid by the Secondary Party during the preceding six (6) month period and with such calculations reflecting actual use as opposed to the projected use included in the definition of Share, as determined by the Secondary Party in good faith (a "***True-Up Invoice***"). Any additional amounts owing by one Party to the other Party will be paid within fifteen (15) Business Days of the receipt of the relevant True-Up Invoice by the applicable Party. Any disputes between the Parties with respect to the amount of such adjustments shall be resolved in accordance with Section 6.6.3.

10.1.5 <u>Invoice Disputes</u>.  If either Party disputes the correctness of any Invoice or True-Up Invoice delivered to them, then such Party shall:

(a)    nevertheless pay the undisputed portion of such Invoice or True-Up Invoice (but shall not be required to pay the disputed amount); and

(b)    concurrently with payment of the undisputed portion, notify the applicable counterparty of the disputed amount with a reasonably detailed explanation of the dispute.

Any disputed amount ultimately determined to be due (and any overpayment) shall bear interest at the Default Rate from the date such amount was required to have been made until paid (or from the date of payment until the date of refund in the case of overpayments).

## ARTICLE 11
## REPRESENTATIONS AND WARRANTIES

**11.1**  **General**.  Each Party represents and warrants for the benefit of the other Party, as of the date hereof, that:

(a)    such Party: (i) is an entity, duly organized and existing in good standing under the laws of the state of its formation; (ii) has the requisite power and authority to own its properties and carry on its business as now being conducted and currently proposed to be conducted and to execute, deliver, and perform its obligations under this Agreement; and (iii) is qualified to do business in every jurisdiction where such qualification is required by the nature of  its business, the character and location of its property or business, or the ownership of its properties;

(b)    this Agreement has been duly authorized and constitutes the legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms, and each Person signing this Agreement on its behalf is duly and validly authorized to do so;

31

**Exhibit 1**
Confidential

(c)     the execution and delivery of this Agreement and performance of its obligations hereunder will not require the approval of any Governmental Authority or further consent of any other Person or entity and will not contravene, conflict with or result in the breach or violation of any document to which it is bound or of any Applicable Law to the extent any such breach or violation would reasonably be expected to have a material adverse effect on the ability of such Party to perform its obligations hereunder;

(d)     no suit, action or arbitration, or legal, administrative, or other proceeding is pending or, to its knowledge, threatened against it that would affect the validity or enforceability of this Agreement or the ability of it to fulfill its obligations and commitments hereunder.

**11.2    <u>AS-IS, WHERE-IS</u>**.  EACH RECIPIENT ACCEPTS THE CONDITION OF THE SHARED SERVICES SYSTEMS AND THE SHARED SERVICES SYSTEMS SITE "AS-IS, WHERE IS", WITH ALL FAULTS, WHETHER PATENT OR LATENT. PROVIDER MAKES NO WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE SHARED SERVICES SYSTEMS OR THE SHARED SERVICES SYSTEMS SITE; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT FOR THE AVOIDANCE OF DOUBT THE FOREGOING SHALL NOT RELATE TO OR AFFECT PROVIDER'S OBLIGATIONS UNDER SECTIONS 3.2, 4.2(c), 4.3, OR 7.3(<u>b</u>).

**11.3    <u>DISCLAIMER</u>**.  THE REPRESENTATIONS AND WARRANTIES PROVIDED IN THIS AGREEMENT ARE EXCLUSIVE, AND NO OTHER WARRANTIES OF ANY KIND, WHETHER STATUTORY, EXPRESS, OR IMPLIED (INCLUDING TO ALL WARRANTIES OF MERCHANTABILITY, HABITABILITY, AND FITNESS FOR A PARTICULAR PURPOSE), WILL APPLY TO THE SUBJECT MATTER OF THIS AGREEMENT, AND RECIPIENT EXPRESSLY WAIVES ANY RIGHT TO ANY SUCH WARRANTY.

**ARTICLE 12**
**INDEMNITIES; LIMITATION ON DAMAGES**

**12.1    <u>Indemnity</u>**.

12.1.1  <u>Indemnification by Secondary Party</u>.  Except as otherwise set forth in this Agreement, to the fullest extent permitted by Applicable Law, the Secondary Party shall defend, indemnify, and hold harmless the Indemnitees of the Primary Party from and against any and all Liabilities of, or suffered or incurred by, any such Indemnitee (even if caused by such other Party's ordinary active or passive negligence) that arise out of, or assertedly arise out of: (a) any damage to the Facility or any other property of such Party; (b) any injury to, or death of, any Secondary Party Permittee of the Secondary Party when any Secondary Party Permittee is visiting or working at the Shared Services Systems Site; (c) the failure by any Secondary Party Permittee of the Secondary Party to comply with Applicable Laws in connection with their respective acts or omissions at the Shared Services Systems Site; (d) any actual or alleged presence or Release of Hazardous

US-DOCS\101520926.60

**Exhibit 1**
Confidential

Materials with respect to the Secondary Party's Facility or otherwise on or from any Real Estate Asset of the Secondary Party, any actual or alleged Hazardous Materials Activity related in any way to the Secondary Party and, if the Secondary Party is LBR, the Refinery, or if the Secondary Party is LBT, the Terminal, or any of its respective subsidiaries or any actual or alleged violation of Environmental Law or Environmental Action related in any way to the Secondary Party and, if the Secondary Party is LBR, the Refinery, or if the Secondary Party is LBT, the Terminal, or any of its respective subsidiaries (except to the extent caused, contributed to or exacerbated by any Indemnitee); (e) the installation, operation, maintenance, or repair of such Party's Facility; (f) any breach of this Agreement by the Secondary Party or any Secondary Party Permittee of the Secondary Party; or (g) any of the matters specified in clauses (a) through (f) of Section 12.1.2, solely to the extent the Secondary Party has been designated as, and has accepted designation as, a subcontractor of Primary Party pursuant to Section 6.2 and solely with respect to any Shared Services System, Shared Authorization, Shared Service or other matter subcontracted to the Secondary Party; provided, however, that the Secondary Party shall have no obligation to indemnify, defend, or hold harmless any Indemnitee: (x) of Primary Party for any Liability under clauses (c), (e), or (f) above (but, for the avoidance of doubt, not including any Liabilities under clauses (a), (b), (d) or (g) above) if and to the extent that such Liability consists or arises out of, or assertedly consists or arises out of, any event or circumstance described in clause (a) or (b) of Section 12.1.2; or (y) of the other Party to the extent such Liability arises from the grossly negligent action, inaction, or omission of, or the willful misconduct of, such Indemnitee.

12.1.2  Indemnification of the Secondary Party.  Except as otherwise set forth in this Agreement, to the fullest extent permitted by Applicable Law, Primary Party shall defend, indemnify, and hold harmless the Secondary Party Indemnitee from and against any and all Liabilities of, or suffered or incurred by, such Indemnitee (even if caused by the Secondary Party's active or passive negligence) that arise out of, or assertedly arise out of: (a) any damage to the Shared Services Systems (except to the extent such damage is not or would not be covered by the insurance that this Agreement requires Primary Party to obtain), the Primary Party's Facility, Shared Services Systems Site, or any other property of Primary Party other than the Shared Services Systems; (b) any injury to, or death of, any Primary Party Permittee when visiting or working at the Shared Services Systems Site; (c) the failure by any Primary Party Permittee to comply with Applicable Laws in connection with their respective acts or omissions at the Shared Services Systems Site; (d) any actual or alleged presence or Release of Hazardous Materials with respect to the Primary Party's Facility or otherwise on or from any Real Estate Asset of the Primary Party, any actual or alleged Hazardous Materials Activity related in any way to the Primary Party and, if the Primary Party is LBR, the Refinery, or if the Primary Party is LBT, the Terminal, or any of its respective subsidiaries or any actual or alleged violation of Environmental Law or Environmental Action related in any way to the Primary Party and, if the Primary Party is LBR, the Refinery, or if the Primary Party is LBT, the Terminal, or any of its respective subsidiaries (except to the extent caused, contributed to or exacerbated by any Indemnitee); (e) the construction,

US-DOCS\101520926.60

Exhibit 1
Confidential

operation, maintenance, repair, decommissioning, or demolishing of the Primary Party's Facility; (f) any breach of this Agreement by the Primary Party or any Primary Party Permittee; or (g) any of the matters specified in clauses (a) through (f) of Section 12.1.1, solely to the extent the Primary Party has designated, and the Secondary Party has accepted designation as, a subcontractor of Primary Party pursuant to Section 6.2 and solely with respect to any Shared Services System, Shared Authorization, Shared Service or other matter subcontracted to the Secondary Party; provided, however, that Primary Party shall have no obligation to indemnify, defend, or hold harmless any Indemnitee of the Secondary Party for any Liability: (x) under clauses (c), (e), or (f) above (but, for the avoidance of doubt, not including any Liabilities under clauses (a), (b), (d) or (g) above) if and to the extent that such Liability consists or arises out of, or assertedly consists or arises out of, any event or circumstance described in clause (a) or (b) of Section 12.1.1 with respect to the Secondary Party; (y) of any other Secondary Party for any Liability under clauses (c), (e), or (f) above (but, for the avoidance of doubt, not including any Liabilities under clauses (a), (b), or (d) above) if and to the extent that such Liability consists or arises out of, or assertedly consists or arises out of, any event or circumstance described in clause (a) or (b) of this Section 12.1.1 with respect to the Secondary Party; or (z) to the extent such Liability arises from the grossly negligent action, inaction, or omission of, or the willful misconduct of, such Indemnitee.

12.1.3   Joint Causation.  To the extent any indemnitor hereunder is obligated to indemnify or hold harmless any indemnitee for any Liability pursuant to Section 12.1.1(c)-(f) or Section 12.1.2(c)-(f) above where there is joint or concurring causation by such indemnitee, such indemnity obligation shall be construed as providing for the application of comparative negligence/fault principles to allocate liability as between the applicable indemnitor and indemnitee.

12.1.4   Release of Primary Party Permittees and Other Secondary Party Permittees.  Except to the extent prohibited by Applicable Law and except for Liabilities described in Section 12.1.2(d), the Secondary Party shall, and shall cause each of its Secondary Party Permittees to, release any Primary Party Permittee, as well as each other Secondary Party Permittee, from and against any and all Liabilities to the extent resulting from or arising out of any injury to, or death of, any of the Secondary Party's Secondary Party Permittees, or any damage to or destruction of the Secondary Party's Facility or any other property of the Secondary Party or its Secondary Party Permittees.

12.1.5   Release of Secondary Party Permittees.  Except to the extent prohibited by Applicable Law and except for Liabilities described in Section 12.1.1(d), Primary Party shall, and shall cause any Primary Party Permittee to, release the Secondary Party and each of its Secondary Party Permittees from and against any and all Liabilities to the extent resulting from or arising out of any injury to, or death of, any Primary Party Permittee, or any damage to or destruction of the Shared Services Systems, the Primary Party's Facility, the Shared Services Systems Site, or any other property of any Primary Party Permittee; provided that nothing in this Section

US-DOCS\101520926.60

Exhibit 1
Confidential

12.1.5 shall waive or in any way limit the Secondary Party's obligations under this Agreement to reimburse Primary Party for Shared Expenses.

12.1.6 <u>Waiver of Consequential Damages</u>.

(a)    In no event will either Party be liable under any circumstances to the other Party for: special, indirect, punitive, incidental, exemplary or consequential damages or losses; loss of business opportunity; except as set forth below in this Section 12.1.6, lost profits; or other similar damages resulting from or arising out of this Agreement, by statute, in tort or contract, under any indemnity provision or otherwise.

(b)    The limitation on potential lost profits set forth in Section 12.1.6(a) shall not be deemed to bar recovery of direct damages in the form of lost profits to the extent that (x) such damages were (i) the direct, natural, probable and reasonably foreseeable consequences of a breach of a material provision of this Agreement by a Party in bad faith or intentionally, or (ii) caused by the gross negligence or willful misconduct of the Party against whom a claim for recovery is being asserted by a Party and (y) the claiming Party has, and has procured that its Affiliates have, taken reasonable actions and due care to mitigate any claims (or potential losses or damages) under this Agreement. Nothing in this Agreement shall or shall be deemed to relieve any Party of any common law or other duty to mitigate any losses incurred by it.

12.1.7 <u>WAIVER OF RIGHT OF PARTITION</u>.    EACH PARTY ACKNOWLEDGES AND AGREES THAT IT WOULD BE PREJUDICIAL TO THE INTEREST OF THE OTHER PARTY UNDER THIS AGREEMENT IF ANY PARTY WERE TO SEEK PARTITION OR ANY OTHER TYPE OF DIVISION OF THE SHARED SERVICES SYSTEMS, SHARED SERVICES SYSTEMS SITE, SHARED AUTHORIZATIONS, SHARED PREMISES AGREEMENTS OR SHARED PREMISES, OR FILE AN ACTION FOR SUCH PARTITION OR DIVISION. THEREFORE, IN CONSIDERATION OF SUCH FACT AND FOR OTHER GOOD AND VALUABLE CONSIDERATION, EACH OF THE PARTIES HEREBY WAIVES AND RELINQUISHES ANY AND ALL RIGHTS THAT IT MAY HAVE TO SEEK A PARTITION OR ANY OTHER TYPE OF DIVISION OF THE SHARED SERVICES SYSTEMS, SHARED SERVICES SYSTEMS SITE, SHARED AUTHORIZATIONS, SHARED PREMISES AGREEMENTS OR SHARED PREMISES.

**ARTICLE 13**
**NOTICES**

**13.1** **Notices**.  All notices or other communications required or permitted by this Agreement shall be in writing (including in electronic form).  All notices and payments shall be sent to the Parties at the addresses provided below:

Exhibit 1
Confidential

|                | |
|----------------|----------------------------------------|
| If to LBT:     | Limetree Bay Terminals, LLC            |
|                | 1 Estate Hope                          |
|                | Christiansted, St. Croix VI 00820-5652 |
|                | Attention: Rich Layton                 |
|                | Fax: (340) 692-3480                    |
|                | Email: RLayton@Lbterminals.com         |

With a copy to (which shall not constitute notice):

Keith Neal
Email: KNeal@Lbterminals.com

|                | |
|----------------|----------------------------------------|
| If to LBR:     | Limetree Bay Refining, LLC             |
|                | 1 Estate Hope                          |
|                | Christiansted, St. Croix               |
|                | U.S. Virgin Islands 00820-5652         |
|                | Facsimile: (340) 692-3480              |
|                | Attention: Brian Lever                 |
|                | Email:  blever@lbterminals.com         |

All notices will be deemed delivered:

(a)    when presented personally;

(b)    one (1) Business Day after being delivered to a national courier service for overnight delivery, addressed to the receiving Party at the address specified above (or such other address as the receiving Party may have specified by notice delivered to the delivering Party at its address specified above);

(c)    five (5) days after being deposited in a United States Postal Service receptacle, postage prepaid, registered or certified, return receipt requested, addressed to the receiving Party at the address specified above (or such other address as the receiving Party may have specified by notice delivered to the delivering Party at its address specified above); or

(d)    if delivered by electronic mail; provided the relevant computer record indicates a full and successful transmission or no failure message is generated: (x) on the date of such transmission, if such transmission is completed at or prior to 5:00 p.m., local time of the recipient party, on the date of such transmission; and (y) on the next Business Day following the date of transmission, if such transmission is completed after 5:00 p.m., local time of the recipient party, on the date of such transmission.

Either Party may change its address (including the electronic mail address) for receiving notices and communications hereunder by giving notice as required by this Section 13.1.

US-DOCS\101520926.60

Exhibit 1
Confidential

To the extent the Parties are Affiliates under common control, the failure to deliver any notice required hereunder shall not be deemed to be a default under or cause a breach of this Agreement or require any party to pay damages or provide any other remedy to the other Party, except to the extent such notices are required to be delivered to any Financing Party of either Party. During the term of the Tolling Agreement, each Party shall also deliver to LBRM all notices of breach delivered such Party to the other Party.

**ARTICLE 14**
**MISCELLANEOUS**

**14.1**   **Several Obligations; Relationship of Parties**.  The duties, obligations, and liabilities of the Parties under this Agreement are intended to be several and not joint or collective, and no Party shall be jointly and severally liable for the acts, omissions, or obligations of another Party.   Nothing contained in this Agreement shall be construed to create an association, joint venture, or partnership, or impose a partnership duty, obligation, or liability, among the Parties.  No Party shall have the right nor the power to bind the other Party without its express written consent, except as expressly otherwise provided in this Agreement.

**14.2**   **Force Majeure**.

   14.2.1   <u>General</u>.  Without derogating from any other provision of this Agreement, if the performance of the obligations of either Party under this Agreement, or the fulfillment of any of the conditions hereof, shall be wholly or partially prevented by any act or event beyond the reasonable control of the Party alleging disability to perform such obligations or fulfill such conditions under this Agreement, including an act of God, nuclear emergency, explosion, fire, epidemic, landslide, lightning, earthquake, tornado, hurricane, flood or similar cataclysmic occurrence, an act of public enemy, war, blockade, insurrection, riot, civil disturbance, sabotage, unavailability of labor, fuel, power or raw materials, strike, lockout or other labor disturbance, restrictions or restraints imposed by law or by rule, regulation, or order of governmental authorities, whether federal, state, or local, delays or interruptions in transportation or interruption or loss of utilities (each such event, a "***Force Majeure Event***"), then the Party alleging disability to perform such obligations or fulfill such conditions hereunder shall be excused from whatever performance is affected by the Force Majeure Event to the extent so affected; <u>provided</u>, <u>however</u>, that: (x) economic hardship shall not constitute a Force Majeure Event; and (y) no obligations of either Party which arose before the Force Majeure Event causing the suspension of performance (unless such obligation is actually prevented by such Force Majeure Event), and no payment obligations of either Party, shall be excused as a result of the Force Majeure Event.

   14.2.2   <u>Procedures</u>.  In the event that a Force Majeure Event occurs:

      (a)      the non-performing Party shall give the other Party prompt written notice describing the particulars of s u c h Force Majeure Event, including but not limited to the nature of the occurrence and its expected duration, and

37

**Exhibit 1**
Confidential

shall continue to furnish timely and regular reports with respect thereto during the period of such Force Majeure Event;

(b)    the suspension of performance shall be of no greater scope and of no longer duration than is required for the non-performing Party to overcome such Force Majeure Event;

(c)    no such suspension shall effect an extension of the term of this Agreement; and

(d)    the non-performing Party shall use commercially reasonable efforts to remedy its inability to perform.

14.3   **Entire Agreement**.  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior negotiations, agreements, or understandings of the Parties of any nature, whether oral or written, relating thereto.

14.4   **Cooperation; Further Assurances**.  Each Party shall reasonably support and cooperate with the other Party in the conduct of its operations and the exercise of its rights hereunder, and in carrying out and otherwise giving full force and effect to the purpose and intent of this Agreement, including in a Party's efforts to obtain from any Governmental Authority or any other Person any permit, entitlement, approval, Authorization, or other rights necessary or convenient in connection with its operations and/or the exercise of its rights hereunder; and each Party shall, without demanding additional consideration therefor, promptly execute, and, if appropriate, cause to be acknowledged and recorded, any map, application, document, or instrument that is reasonably requested by the other Party or any Governmental Authority in connection therewith.  If either Party reasonably determines or is reasonably advised that any further instruments or actions are necessary or desirable to carry out the terms of this Agreement, then the other Party shall execute and deliver all such instruments and perform all such actions reasonably necessary and proper to carry out the terms of this Agreement.

14.5   **Captions**.  All Section or Article titles or captions contained in this Agreement are for convenience only and shall not be deemed to be a part of this Agreement or affect the meaning or interpretation of this Agreement.

14.6   **Severability**. Whenever possible, each provision and term of this Agreement shall be interpreted in a manner so as to be effective and valid. If any term or provision of this Agreement, or the application of any such term or provision to any Person or circumstance, shall be held invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, then the remaining provisions hereof, or the application of such term or provision to Persons or circumstances other than those as to which it has been held invalid, illegal, or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

14.7   **Parties in Interest; Assignment; Sale of Shared Services Systems**.

US-DOCS\101520926.60

Exhibit 1
Confidential

14.7.1   This Agreement is binding upon and is for the benefit of the Parties hereto and their respective successors and permitted assigns.  LBRM and, so long as the Tolling Agreement is in effect, BP, are each an intended beneficiary of this Agreement during the term of the Tolling Agreement. This Agreement is not made for the benefit of any party not a Party hereto other than LBRM and, so long as the Tolling Agreement is in effect, BP, and no party other than the Parties hereto, LBRM and, so long as the Tolling Agreement is in effect, BP and their respective successors and permitted assigns will acquire or have any benefit, right, remedy, or claim under or by virtue of this Agreement.

14.7.2   The Secondary Party may not assign or transfer this Agreement or any of the Secondary Party's rights or obligations hereunder without the prior written consent of the Primary Party, such consent not to be unreasonably withheld, conditioned, or delayed; provided, however, that notwithstanding the foregoing, the Secondary Party may, without the consent of the other Party, assign or transfer this Agreement and its rights and obligations hereunder to: (a) any Person succeeding to all or substantially all of the Secondary Party's interest in its Facility; or (b) either Party providing financing for the Secondary Party or its Affiliates.

14.7.3   The Primary Party may not assign or transfer this Agreement or any of Primary Party's rights or obligations hereunder without the prior written consent of each of the other Parties, such consent not to be unreasonably withheld, conditioned, or delayed; provided, however, that notwithstanding the foregoing, the Primary Party may, without the consent of the other Party, assign or transfer this Agreement and its rights and obligations hereunder to: (a) any Person succeeding to all or substantially all of such Primary Party's interest in the Primary Party's Facility and the Shared Services Systems; or (b) any Financing Party providing financing for such Primary Party or its Affiliates.

14.7.4   If either Party assigns this Agreement to a Financing Party in accordance with Section 14.8.2 or Section 14.8.3, then: (a) the other Party shall negotiate and execute a customary consent to collateral assignment for the benefit of such Financing Party that provides such Financing Party with customary lender protections, including extended cure periods, rights relating to foreclosure, and the ability to secure a replacement agreement if this Agreement is rejected in bankruptcy; and (b) if the Primary Party is the Party assigning its rights under this Agreement to a Financing Party, then such Primary Party shall use commercially reasonable efforts to cause such assignment to be subject to a non-disturbance or similar agreement pursuant to which such Primary Party's Financing Party agrees that, in the event of the exercise or enforcement of the Financing Party's liens on the Shared Services Systems or Shared Services Systems Site, this Agreement and the Secondary Party's rights hereunder will not be terminated or otherwise impaired, all on such terms and conditions as could not reasonably be expected to materially impair the Secondary Party's operation, maintenance, and repair of its Facility or the generation or distribution of electricity therefrom or materially increase the expenses to be paid by the Secondary Party in the operation, maintenance, and repair of its Facility.

39

Exhibit 1
Confidential

**14.8    Governing Law; Dispute Resolution**.

14.8.1    Agreement to Arbitrate.  If a dispute arises between the Parties regarding the terms, covenants, conditions, application, interpretation, enforceability, validity, performance, or breach of this Agreement or any matter arising out of, connected with, or relating to this Agreement, whether sounding in contract, tort, unfair competition, law, equity, or any other legal form (a "***Dispute***"), then such Dispute shall be resolved solely by final and binding arbitration administered by the American Arbitration Association (or its successor) ("***AAA***") and governed by the AAA's Commercial Arbitration Rules then in effect.

14.8.2    Demand for Arbitration; Arbitrators.  Either Party or LBRM may submit a Dispute to final and binding arbitration by filing a notice of demand for arbitration.  Any notice of demand for arbitration shall be in writing and shall be delivered to the other Party and the AAA. The Dispute shall be heard by three (3) neutral arbitrators, who shall each be selected as follows: (a) The Primary Party shall nominate an arbitrator within fifteen (15) Business Days of its receipt of the demand for arbitration (unless Such Primary Party is the Party demanding arbitration, in which case Such Primary Party shall nominate an arbitrator in its demand for arbitration); (b) the Secondary Party shall nominate an arbitrator within fifteen (15) Business Days of the demand for arbitration; provided that if the Secondary Party is unable to designate an arbitrator within such fifteen (15) Business Days period, then the AAA shall appoint an arbitrator for the Secondary Party in accordance with the AAA rules then in effect; and (c) within fifteen (15) Business Days of the appointment of the two (2) arbitrators by the AAA (which period may be extended upon agreement of the Parties), the two (2) arbitrators shall jointly nominate the third arbitrator, who shall serve as the chair of the arbitration.  If the two arbitrators cannot agree on the appointment of the chair within the designated period, then the AAA shall appoint the chair in accordance with the AAA rules then in effect.

14.8.3    Seat and Location of Arbitration; Language.  The Parties agree that the seat of any arbitration shall be New York.  All proceedings before the arbitrators shall be in New York, New York, or such other place as the Parties and arbitrators may agree, and shall be conducted in the English language.

14.8.4    Arbitrators' Powers.  The tribunal shall not have the right to award lost profits, consequential, incidental, indirect, special, treble, multiple, or punitive damages; provided that no amounts payable pursuant to this Agreement (including liquidated damages) shall be deemed to constitute irrecoverable lost profits, consequential, incidental, indirect, special, treble, multiple, or punitive damages. The tribunal shall have full power and discretion as to matters of arbitration procedure, including but not limited to the power to order interim relief or any other procedural remedy that would have been available to the Parties had the matter been heard in court.

14.8.5    Arbitration Award.  The arbitration award shall be issued in writing in the English language and shall state the reasons upon which it is based.  The award issued by the tribunal shall be final and binding on the Parties and not subject to any judicial

US-DOCS\101520926.60

Exhibit 1
Confidential

review or challenge whatsoever, to the maximum extent permitted by law. The award shall be paid within thirty (30) days after the date it is issued and shall be paid in United States dollars in immediately available funds, free and clear of any liens, taxes, or other deductions. A judgment recognizing or enforcing such award may be rendered by any court of competent jurisdiction.

14.8.6    Fees and Costs. The arbitrators shall be empowered to award the prevailing Party its reasonable arbitration costs, including reasonable attorneys' fees and expert fees, and the costs associated with the arbitration. Each Party shall bear its own fees and costs until the arbitrators determine which, if any, Party is the prevailing Party and the amount that is due to such prevailing Party.

14.8.7    Confidentiality. The arbitration shall be confidential; provided that such matters may be disclosed without the prior consent of the other Parties to lenders, investors, affiliates, auditors, or tax or other Governmental Authorities, or as may be required by law.

14.8.8    Injunctive Relief.

(a)    Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement is intended to, nor shall it, prevent the Parties from seeking injunctive relief in aid of arbitration. Such injunctive relief may be sought from any court of competent jurisdiction or the arbitrators, irrespective of whether arbitration has been initiated pursuant to this Section.

(b)    If either Party initiates or attempts to initiate judicial proceedings to resolve a Dispute that is within the scope of this Section or to prevent or frustrate arbitration that has been or will be initiated pursuant to this Section, then the other Party will be entitled to appropriate relief in court or from AAA to enjoin, stay, suspend, or otherwise prevent such judicial proceedings, whether or not arbitration has been or will be initiated in connection with the matter that is subject to arbitration pursuant to this Section. The Parties agree that the Party which initiates or attempts to initiate such judicial proceedings hereby waives and is barred from raising in court or any other forum any argument, objection, or claim against such relief. The Parties further agree that the Party seeking the injunction, stay, suspension, or similar relief will not be required to provide any undertaking or security in order to obtain such relief.

(c)    No Party may initiate an action seeking to annul an arbitration award in a court that is not within the seat of the arbitration. If either Party initiates or attempts to initiate an action seeking to annual an arbitration award in a court that is not within the seat of the arbitration, the other Party shall be entitled to appropriate relief in that court, a court within the seat of the arbitration, and any other forum, to enjoin, stay, suspend, or otherwise prevent the annulment action that is prohibited by this Section. The Parties agree that the Party which initiates or attempts to initiate an annulment

US-DOCS\101520926.60

Exhibit 1
Confidential

action in a court that is not within the seat of the arbitration hereby waives and is barred from raising any argument, objection, or claim against such relief. Furthermore, the Parties agree that the Party seeking the injunction, stay, suspension, or similar relief will not be required to provide any undertaking or security in order to obtain such relief.

14.8.9 <u>Arbitrability</u>. The terms of this Agreement requiring arbitration are self-executing. It is unnecessary for either Party to petition a court to compel arbitration in order to initiate arbitration. Each Party hereby irrevocably submits itself to the jurisdiction of the arbitration tribunal specified in this Section. The Parties agree that any issues regarding the jurisdiction of the arbitrators, the agreement to arbitrate, and the arbitrability of any claims or disputes arising under, relating to, or in connection with this Agreement are issues solely for the arbitrators, not a court, to decide. Each of the Parties expressly waives any right it may have to seek in court, including in enforcement proceedings, a determination on the jurisdiction of the arbitrators, the agreement to arbitrate, or the arbitrability of any claims or disputes.

14.8.10 **WAIVER OF RIGHT TO A TRIAL BY JURY OR OTHERWISE. THE PARTIES HEREBY EXPRESSLY WAIVE ALL RIGHTS TO TRIAL BY JURY OR OTHERWISE ON ANY CLAIM, CAUSE OF ACTION, SUIT OR PROCEEDING DIRECTLY OR INDIRECTLY INVOLVING OR RELATED TO THE TERMS, COVENANTS, CONDITIONS, APPLICATION, INTERPRETATION, ENFORCEABILITY, VALIDITY, PERFORMANCE, OR BREACH OF THIS AGREEMENT OR ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH OR RELATED TO THIS AGREEMENT. THE PROVISIONS OF THIS AGREEMENT RELATING TO WAIVER OF TRIAL BY JURY SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT.**

14.8.11 <u>Governing Law</u>. This Agreement, and any disputes relating to, arising out of, or connected with this Agreement, shall in all respects be governed by and construed in accordance with the laws of the State of New York, without giving effect to: (a) any laws thereof that might vest jurisdiction in a court to determine the timeliness of making a demand for arbitration or of noticing an intention to arbitrate, including but not limited to New York C.P.L.R. § 7502(b); or (b) any choice of law rules thereof which might direct the application of the laws of another jurisdiction.

14.8.12 <u>Service of Process</u>. In any arbitration or any other proceeding concerning a Dispute, including a judicial proceeding in aid of arbitration or to recognize and enforce an arbitration award, each of the Parties irrevocably consents to receive process solely in accordance with <u>Article 13</u>. For the avoidance of doubt, each Party irrevocably waives any right it may have to receive process in accordance with The Hague Convention or any other treaty, law, or rule of any jurisdiction relating to process.

US-DOCS\101520926.60

Exhibit 1
Confidential

**14.9**  **Amendment**.  This Agreement may be modified, amended, or supplemented only by a written agreement executed by each Party and LBRM. Without limiting the foregoing, the Parties   may amend Exhibits B, D and E of this Agreement within ninety (90) days following the date hereof in order to meet and reflect the reasonable operational requirements of each of the Parties, in each case, subject to the applicable Party's respective obligations under the Operating Agreement and the Financing Documents to which it is a party.

**14.10**  **Survival**.  All rights and obligations that by their nature are to be performed after any termination of this Agreement shall survive any such termination.

**14.11**  **Waiver; Remedies**.  No delay on the part of either Party in exercising any right, power, or privilege hereunder will operate as a waiver thereof, nor will any waiver on the part of either Party of any right, power, or privilege hereunder operate as a waiver of any other right, power, or privilege hereunder, nor will any single or partial exercise of any right, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power, or privilege hereunder.

**14.12**  **Confidentiality**. Each Party recognizes that, in connection with this Agreement, it may become privy to nonpublic information regarding the financial condition, operations, and prospects of the other Party.  Each Party agrees to keep all nonpublic information regarding, or received by, the other Party strictly confidential (including, without limitation, any such nonpublic information received by such Party from its Affiliates or BP), and to use all such information solely in order to effectuate or monitor the purpose of this Agreement; <u>provided</u> that each Party may provide confidential information:

(a)  to its employees, agents, attorneys, accountants, consultants and Affiliates who have a need to know such information in order to negotiate, effectuate, evaluate or monitor this Agreement;

(b)  to its external auditors and to any Governmental Authority having jurisdiction over such Party;

(c)  to any Financing Party (or potential Financing Party) or representative of such Financing Party (or potential Financing Party), so long as such Financing Party (or potential Financing Party or representative) has agreed to keep such information confidential; and

(d)  to any transferee of, or prospective transferee of, any of its rights or obligations under this Agreement, so long as such Person is subject to an agreement containing provisions substantially the same as those of this Section 14.12;

<u>provided</u>, <u>further</u>, that confidential information does not include information:

(i)  once it becomes publicly available without breach of this Agreement;

(ii)  that is rightfully obtained by a Party from another source without a duty of confidentiality; or

**Exhibit 1**

Confidential

(iii)    that is independently developed or ascertained by a Party.

In the event that any of the Parties to this Agreement or any of the employees, agents or Affiliates of such Parties are requested pursuant to, or required by, Applicable Law, regulation or legal process to disclose any of the nonpublic information, such Party will, to the extent permitted by law, promptly notify any affected Party prior to any such disclosure so that such Party may seek a protective order or other appropriate remedy or, in such Party's sole discretion, waive compliance with the terms of this Section 14.12.  In the event that no such protective order or other remedy is obtained, or that such Party waives compliance with the terms of this Section 14.12, the Party required to disclose such nonpublic information or its employees, agents or Affiliates will furnish only that portion of the nonpublic information that it is advised by counsel is legally required and will exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the nonpublic information.

**14.13** **Facsimile; Counterparts**.  Either Party may deliver executed signature pages to this Agreement by facsimile or electronic transmission to the other Parties, which facsimile or electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute a single instrument.

*[Signature pages follow]*

44

**Exhibit 1**
Confidential

IN WITNESS WHEREOF, each Party hereto has executed this Agreement as of the date first written above.

**LIMETREE BAY TERMINALS, LLC**,
a U.S. Virgin Islands limited liability company,

By: _____

Name: Darius Sweet

Title:   Chief Executive Officer

**LIMETREE BAY REFINING, LLC**,
a U.S. Virgin Islands limited liability company,

By: _____

Name: Brian Lever

Title:   President

ACKNOWLEDGED BY:

**LIMETREE BAY REFINERY MARKETING, LLC**,
a U.S. Virgin Islands limited liability company,

By: _____

Name: Brian Lever

Title:   President

*[Signature Page to Shared Services Systems Agreement (Limetree)]*

Confidential
Exhibit 1

IN WITNESS WHEREOF, each Party hereto has executed this Agreement as of the date first written above.

**LIMETREE BAY TERMINALS, LLC,**
a U.S. Virgin Islands limited liability company,

By: _____

Name: Darius Sweet

Title:  Chief Executive Officer


**LIMETREE BAY REFINING, LLC,**
a U.S. Virgin Islands limited liability company,

By: _____

Name: Brian Lever

Title:  President


ACKNOWLEDGED BY:

**LIMETREE BAY REFINERY MARKETING, LLC,**
a U.S. Virgin Islands limited liability company,

By: _____

Name: Brian Lever

Title:  President


*[Signature Page to Shared Services Systems Agreement (Limetree)]*

# EXHIBIT A

## SHARED PREMISES

**Shared Premises (owned, leased or submerged land permit rights held by LBT)**

1. Terminal Plot No. 4 over portions of Estates Blessing, Hope, Jerusalem, and Figtree Hill, consisting of 386.444 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

2. Terminal Plot No. 5 over portions of Estates Figtree Hill and Castle Coakley Land, consisting of 33.773 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

3. Terminal Plot No. 9, Estate Limetree Bay, Reclaimed Land, consisting of 197.4471 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

4. Plot No. 29, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.840 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

5. Plot No. 45, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.790 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

6. Plot No. 52, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 4.070 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

7. Plot No. 53, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 22.137 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

8. Plot No. 53-C, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.734 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

9. Plot No. 5, Estate Caldwall, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 46.111 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

10. Plot No. 3-A, Estate Cottage, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 12.837 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 7, 1991

11. Plot No. 4 Estate Cottage, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 70.000 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 7, 1991

12. Remainder Plot No. 4-B, Estate Blessing, King Quarter, St. Croix, U.S. Virgin Islands, consisting of 35.82 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-131-C018, dated June 26, 2018.

13. Plot No. 2-A, Estate Hope, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 4.475 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-113-C016, dated May 12, 2016

14. Plot No. 6-D Estate Hope, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 26.332 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-113-C016, dated May 12, 2016

A-1

**Exhibit 1**

Confidential

15. Plot No. 13-A, Estate Limetree Bay, Reclaimed Land, consisting of 2.617 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. D9-6551-C017, dated April 26, 2017.

16. Plot No. 8, Estate Limetree Bay, Reclaimed Land (LPG Flare), consisting of 0.030 U.S. acre, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

**Shared Premises (owned, leased or submerged land permit rights held by LBR)**

1. **A portion of Refinery Plot No. 1** (see explanation below) over portions of **Estates Blessing and Hope**, consisting of 175.1634 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

2. **A portion of Refinery Plot No. 2** (see explanation below) over portions of **Estates Blessing, Hope, and Jerusalem**, consisting of 36.686 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

3. **A portion of Refinery Plot No. 3** (see explanation below)  over portions of **Estates Jerusalem, Figtree Hill, and Castle Coakley Land**, consisting of 187.8263 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

   LBR will acquire those portions of Refinery Plots 1, 2 and 3 shown in "blue" on the attached color coded map, less and except those portions of each plot shown in "white" on the attached color coded map as excluded areas ("Excluded Areas") pursuant to the title remediation process contemplated by LBT and LBR. These Excluded Areas include the areas labeled SCPC and Excluded Refinery Process Areas (excluded from Refinery Plot 1), West Sulfur Recovery, Surface Impoundment No. 1, and Surface Impoundment No. 2 (excluded from Refinery Plot 2), and Surface Impoundment No. 3 (excluded from Refinery Plot 3).

4. Plot No. 214, Estate Ruby, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.1914 U.S. acre, more or less, as more fully shown on OLG Drawing No. 4413 dated June 5, 1987.

5. Refinery Plot No. 6, Estate Limetree Bay, Reclaimed Land, consisting of 26.7027 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016; excluding Surface Impoundment 3 as defined in the Refinery Operating Agreement.

6. Refinery Plot No. 7, Estate Limetree Bay, Reclaimed Land, consisting of 19.857 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

A-2

Exhibit 1
Confidential

7. Plot No. 12, Estate Limetree Bay, Reclaimed Land (Flare), consisting of 5.8240 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

**Shared Premises Agreements**

1. Submerged Lands (as defined in the Terminal Operating Agreement)

    a.  Submerged Land Lease (as defined in the Terminal Operating Agreement).

    b.  Submerged Land Permits (as defined in the Terminal Operating Agreement)

    c.  1998 Letter Agreement (as defined in the Terminal Operating Agreement)

2. Existing Easement Agreements dated effective January 4, 2016

    a.  Cross Easement Agreement made effective this 4th day of January, 2016, by and between Limetree Bay Terminals, LLC, a limited liability company organized under the laws of the U.S. Virgin Islands, whose address is c/o Nichols Newman Logan Grey & Lockwood, 1131 King Street, Christiansted, VI 00820, and HOVENSA L.L.C., a limited liability company organized under the laws of the U.S. Virgin Islands whose address is 1 Estate Hope, Christiansted, St. Croix 00820 and recorded on February 6, 2018 in PC 1490, Page 420, Documents No. 2018000482 in the Office of the Recorder of Deeds, Christiansted, St. Croix, U.S. Virgin Islands.

    b.  Easement Agreement made effective this 4th day of January, 2016, by and between Limetree Bay Terminals, LLC, a limited liability company organized under the laws of the U.S. Virgin Islands, whose address is c/o Nichols Newman Logan Grey & Lockwood, 1131 King Street, Christiansted, VI 00820, and HOVENSA L.L.C., a limited liability company organized under the laws of the U.S. Virgin Islands whose address is 1 Estate Hope, Christiansted, St. Croix 00820 and recorded on February 6, 2018 in PC 1490, Page 433, Document No. 2018000484 in the Office of the Recorder of Deeds, Christiansted, St. Croix, U.S. Virgin Islands. [1]

    c.  Easement Agreement made effective this 4th day of January, 2016, by and between HOVENSA L.L.C., a limited liability company organized under the laws of the U.S. Virgin Islands whose address is 1 Estate Hope, Christiansted, St. Croix 00820 as the grantor and Limetree Bay Terminals, LLC, a limited liability company organized under the laws of the U.S. Virgin Islands, whose address is c/o Nichols Newman Logan Grey & Lockwood, 1131 King Street, Christiansted,

---

[1] Reciprocal easement for remediation.

A-3

**Exhibit 1**
Confidential

VI 00820, as the grantee, and recorded on February 6, 2018 in PC 1490, Page 452, Document No. 2018000483 in the Office of the Recorder of Deeds, Christiansted, St. Croix, U.S. Virgin Islands.[2]

d.  Easement Agreement between HOVENSA, L.L.C. and Limetree Bay Terminals, LLC dated January 04, 2016, recorded January 04, 2016 in Photocopy 1422, Page 184, Document No. 2016000009[3]

3.  Grant of Easement from Hess Oil Virgin Islands Corporation in favor of Ansetta E. De Chabert, a perpetual 50' right-of-way and turnabout basin from lands of de Chabert at Jerusalem and Figtree Hill and across Pcl. 6 Jerusalem for access to the channel and turnabout basin to be constructed at Limetree Bay, with an additional guarantee of 1000 linear feet of berthing area along the easterly side of the proposed turnabout basin and conditions of use, dated November 19, 1965 and recorded November 23, 1965 at Photocopy 44-M, Page 295, Document No. 3779.

---

[2] From Hovensa to LBT for access.

[3] Over Government Parcels for access to monitoring stations

A-4

**Exhibit 1**
Confidential



Refinery Option Parcels
Areas Shown in Blue to Be Purchased

**Exhibit 1**

**EXHIBIT B**
**DESCRIPTION OF SHARED SERVICES SYSTEMS, SHARED SERVICES, SHARED AUTHORIZATIONS, AND SHARED EXPENSES**

## I.  SHARED SERVICES SYSTEMS

|  | SHARED SERVICES SYSTEMS | LOCATION OF SHARED SERVICES SYSTEMS | PRIMARY PARTY | SECONDARY PARTY |
|---|---|---|---|---|
| 1. | Power Plant Turbines # 4, 7, 8, 9, 10, 13 | Refinery Plot 3 | LBR | LBT |
| 2. | Wastewater treatment facility | Refinery Plot 3 & 6 | LBR | LBT |
| 3. | Coke domes, handling and loading | Refinery Plot 7 & 8 | LBR | LBT |
| 4. | Sulfur loading | Refinery Plot 3 & Terminal Plot 9 | LBR | LBT |
| 5. | Cottages | Remainder Plot 4-B (Estate Blessing), Refinery Plot 3 (Estate Figtree), Plot 4, Coldwall) | LBT | LBR |
| 6. | Warehouses | Refinery Plot 1, Terminal Plot 9 | LBR | LBT |
| 7. | Main Administration Building | Terminal Plot 4 | LBT | LBR |
| 8. | Limetree Village | Estate Castle Coakley, Plot 53 | LBR | LBT |
| 9. | Laboratory | Terminal Plot 4 | LBR | LBT |
| 10. | Enterprise Resource Planning | N/A | LBR | LBT |
| 11. | Vehicle Garage | Refinery Plot 1 | LBR | LBT |
| 12. | Emergency Response Equipment | Refinery Plot 1 | LBR | LBT |
| 13. | Abandoned SCPC Tanks by Gate #2 | Refinery Plot 1 | LBR | LBT |
| 14. | Boiler #5 | Refinery Plot 1 | LBR | LBT |

B-1

**Exhibit 1**
Confidential

| 15. | Steam Turbine Generator | Refinery Plot 1 | LBR | LBT |
|-----|------------------------|-----------------|-----|-----|
| 16. | Maintenance Shop | Refinery Plot 1 | LBR | LBT |
| 17. | Parking Lots | Refinery Plot 1 | LBR | LBT |
| 18. | All American Canal | Refinery Plot 3 & Terminal Plot 4 & 9 | LBR | LBT |
| 19. | Other Drainage Canals | Refinery Plot 3 | LBR | LBT |

## II.    **SHARED AUTHORIZATIONS**

| Permit | Permit Holder | Agency |
|--------|--------------|--------|
| SPM Army Corps of Engineers Permit | LBT | ACE |
| Amendment to SPM CZM Permit CZX-29-17 | LBT | DPNR |
| ATC/PTO Pump Upgrade, Gasolines Loading MVCS, and SPM STX-895-AC-PO-18 | LBT | DPNR |
| Submerged Land Permits SLP-3, SLP-23, SLP-52, SLP-167 and Container Port Lease and Contract | LBT | DPNR |
| Coker Loading Dock CZM Permit CZX-6-99W | LBT | DPNR |
| Krause Lagoon Channel CZM Permit CZX-24-93W | LBT | DPNR |
| Terminal Facility License TFL-STX-001 | LBT/LBR | DPNR |
| Hazardous Waste Generation and Storage STX C-093 | LBT/LBR | DPNR |
| Special Solid Waste Generation, Storage, Treatment and Disposal STX-270 | LBT/LBR | DPNR |
| Title V operating permit | LBT/LBR | EPA/DPNR |
| NSR permits | LBR/LBT | EPA |
| Consent Decree | LBR/LBT | DPNR/EPA |
| TPDES VI0000019 | LBT/LBR | DPNR |
| Process Makeup Water Groundwater Wells Appropriation Permits 2012-530-0944 | LBR | DPNR |
| CZM Development Permit for MARPOL project | LBT/LBR | DPNR |

B-2

**Exhibit 1**
Confidential

| Building permits, road closing permits for Limetree Bay Village | LBT/LBR | USVI |

B-3

**Exhibit 1**
Confidential

## EXHIBIT C
## <u>MEMORANDUM OF SHARED SERVICES SYSTEMS AGREEMENT</u>

This Memorandum of Shared Services Systems Agreement (the "***Memorandum***") is made and entered into as of November 30, 2018, by and among (a) LIMETREE BAY TERMINALS, LLC, a U.S. Virgin Islands limited liability company ("***LBT***") and (b) LIMETREE BAY REFINING, LLC, a U.S. Virgin Islands limited liability company ("***LBR***").

1.      LBT owns an interest in certain real property as described in those instruments listed on <u>Annex A</u> hereto, as they may be amended from time to time (the "**LBT Shared Property**").

2.      LBR owns an interest in certain real property as described in those instruments listed on <u>Annex B</u> hereto, as they may be amended from time to time (the "**LBR Shared Property**").

3.      LBT and LBR have executed and entered into that certain Shared Services Systems Agreement, (the "**Agreement**") dated as of the date hereof, pursuant to which the parties thereto have agreed (a) to share in certain costs and expenses of development of the LBT Shared Property and LBR Shared Property and otherwise to cooperate with one another in the development of the Shared Services Systems (as defined therein), all upon the terms and conditions set forth therein and (b) to provide certain limited services to the other parties with respect to the LBT Shared Property and LBR Shared Property as specified therein.

4.      The commencement date of the Agreement is November 30, 2018.  The Agreement shall terminate on the mutual agreement of LBT and LBR or as otherwise provided in the Agreement.

5.      This Memorandum shall inure to the benefit of and be binding upon LBT and LBR, and their respective heirs, executors, administrators, successors and assigns; <u>provided</u>, <u>however</u>, that this Memorandum is not intended to, and shall not, modify, amend, limit or expand any of the terms or provisions of the Agreement or any of the rights granted to LBT and LBR under the Agreement.  The covenants, terms, conditions and restrictions of the Agreement shall be binding upon, and inure to the benefit of the Parties thereto and shall continue as a servitude running with each of the Terminal Site (as defined therein) and Refinery Site (as defined therein).   In the event of any conflict between the terms and provisions of this Memorandum and the terms and provisions of the Agreement, the terms and provisions of the Agreement shall prevail. The terms and provisions of the Agreement are incorporated herein by this reference.

[Next pages are signature pages.]

**Exhibit 1**

Executed on the date of acknowledgement to be effective as of the date first set forth hereinabove.

**LBT**:

**LIMETREE BAY TERMINAL, LLC**,
a U.S. Virgin Islands limited liability company,

By: _____

Name: _____

Title: _____

_____
Witness 1

_____
Witness 2

_____ )
                          )
_____ )

The foregoing instrument was acknowledged before me this _____ day of _____ 2018 by _____ as _____ of Limetree Bay Terminals, LLC, a U.S. Virgin Islands limited liability company, on behalf of said limited liability company.

_____

NOTARY PUBLIC

**Exhibit 1**
Confidential

**LIMETREE BAY REFINING, LLC**,
a U.S. Virgin Islands limited liability company,

By: _____

Name: _____

Title: _____

_____
Witness 1

_____
Witness 2

_____ )
                                                         )
_____ )

    The foregoing instrument was acknowledged before me this _____ day of _____ 2018 by _____ as _____ of Limetree Bay Refining, LLC, a U.S. Virgin Islands limited liability company, on behalf of said limited liability company.

_____

NOTARY PUBLIC

C-3

**Exhibit 1**

Confidential

ANNEX A
to
Memorandum of Shared Services Systems Agreement

1. Terminal Plot No. 4 over portions of Estates Blessing, Hope, Jerusalem, and Figtree Hill, consisting of 386.444 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

2. Terminal Plot No. 5 over portions of Estates Figtree Hill and Castle Coakley Land, consisting of 33.773 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

3. Terminal Plot No. 9, Estate Limetree Bay, Reclaimed Land, consisting of 197.4471 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

4. Plot No. 29, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.840 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

5. Plot No. 45, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.790 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

6. Plot No. 52, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 4.070 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

7. Plot No. 53, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 22.137 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

8. Plot No. 53-C, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.734 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

9. Plot No. 5, Estate Caldwall, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 46.111 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

10. Plot No. 3-A, Estate Cottage, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 12.837 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 7, 1991

11. Plot No. 4 Estate Cottage, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 70.000 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 7, 1991

12. Remainder Plot No. 4-B, Estate Blessing, King Quarter, St. Croix, U.S. Virgin Islands, consisting of 35.82 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-131-C018, dated June 26, 2018.

13. Plot No. 2-A, Estate Hope, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 4.475 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-113-C016, dated May 12, 2016

14. Plot No. 6-D Estate Hope, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 26.332 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-113-C016, dated May 12, 2016

US-DOCS\101520926.60

**Exhibit 1**
Confidential

15. Plot No. 13-A, Estate Limetree Bay, Reclaimed Land, consisting of 2.617 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. D9-6551-C017, dated April 26, 2017.

16. Plot No. 8, Estate Limetree Bay, Reclaimed Land (LPG Flare), consisting of 0.030 U.S. acre, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

C-5

**Exhibit 1**

Confidential

ANNEX B
to
Memorandum of Shared Services Systems Agreement

1. **A portion of Refinery Plot No. 1** (see explanation below) over portions of **Estates Blessing and Hope**, consisting of 175.1634 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

2. **A portion of Refinery Plot No. 2** (see explanation below) over portions of **Estates Blessing, Hope, and Jerusalem**, consisting of 36.686 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

3. **A portion of Refinery Plot No. 3** (see explanation below) over portions of **Estates Jerusalem, Figtree Hill, and Castle Coakley Land**, consisting of 187.8263 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

LBR will acquire those portions of Refinery Plots 1, 2 and 3 shown in "blue" on the attached color coded map, less and except those portions of each plot shown in "white" on the attached color coded map as excluded areas ("Excluded Areas") pursuant to the title remediation process contemplated by LBT and LBR. These Excluded Areas include the areas labeled SCPC and Excluded Refinery Process Areas (excluded from Refinery Plot 1), West Sulfur Recovery, Surface Impoundment No. 1, and Surface Impoundment No. 2 (excluded from Refinery Plot 2), and Surface Impoundment No. 3 (excluded from Refinery Plot 3).

4. Plot No. 214, Estate Ruby, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.1914 U.S. acre, more or less, as more fully shown on OLG Drawing No. 4413 dated June 5, 1987.

5. Refinery Plot No. 6, Estate Limetree Bay, Reclaimed Land, consisting of 26.7027 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016, excluding Surface Impoundment 3 as defined in the Refinery Operating Agreement.

6. Refinery Plot No. 7, Estate Limetree Bay, Reclaimed Land, consisting of 19.857 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

7. Plot No. 12, Estate Limetree Bay, Reclaimed Land (Flare), consisting of 5.8240 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

C-6

**Exhibit 1**
Confidential



**Exhibit 1**

**EXHIBIT D**
Undivided Interest Sale

| | SHARED SERVICES SYSTEMS | LBR SHARE | LBT SHARE |
|---|---|---|---|
| 1. | Turbines # 4, 7, 8 | 70% | 30% |
| 2. | Turbines # 9, 10, 13 | 90% | 10% |
| 3. | Wastewater treatment facility | 80% | 20% |
| 4. | Electrical transmission | 80% | 20% |
| 5. | Piping | 70% | 30% |
| 6. | Coke domes, handling and loading | 100% | 0% |
| 7. | Sulfur loading | 100% | 0% |
| 8. | Cottages | 0% | 100% |
| 9. | Warehouses | 80% | 20% |
| 10. | Main Administration Building | 80% | 20% |
| 11. | Laboratory | 90% | 10% |
| 12. | Laboratory Equipment | 100% | 0% |
| 13. | Compressed air | 95% | 5% |
| 14. | Potable water | 80% | 20% |
| 15. | Steam | 95% | 5% |
| 16. | Nitrogen | 95% | 5% |
| 17. | All Other Buildings | 50% | 50% |

D-1

**Exhibit 1**

**EXHIBIT E**

Shared Expense Allocation Criteria

## I. Overview

Section II of this Exhibit E sets forth the intentions of the Parties with respect to certain elements of the cost allocation methodology for certain Shared Services and Shared Services Systems. The Parties hereby agree that the following principles apply to the cost allocation methodology for the Shared Services and Shared Services Systems listed on Section II of this Exhibit E:

- Unless otherwise specified, Shared Expenses shall be allocated between the Parties monthly.

- As provided in Section 4.1 and 5.8 of the Shared Services Systems Agreement and subject to the terms thereof, the Parties and, subject to Section 14.7.1 of the Shared Services Systems Agreement, BP shall have access to the monthly invoices and supporting detail.

- All fixed dollar-denominated quantities in Section II, excluding the costs for Coke and Sulphur handling, shall be escalated annually based on the Consumer Price Index (CPI) (or, in the case of Shared Expenses relating to the Cottages and/or Limetree Village, at 75% of the Consumer Price Index). The escalation shall be made as part of the annual budgeting process.

- Approach to fixed costs: Prior to the Commissioning Period (as defined in the Tolling Agreement), the Provider will allocate a reasonable share of the fixed costs to each of the Parties based on pro forma average usage of the applicable Shared Service or Shared Services System. Starting at the beginning of the Commissioning Period (as defined in the Tolling Agreement) and, absent a Major Event, continuing for the Term of this Agreement, each Party's share of fixed costs for the Shared Services and Shared Services Systems will be the Fixed Cost Allocation amounts specified in Section II of this Exhibit E, without modification. The fixed costs shall include baseload costs as well as any costs for required spare capacity or back-up systems.

- Approach to variable costs: Each Party's share of variable costs for the Shared Services and Shared Services Systems will be based on actual usage where commercially reasonable and estimated usage otherwise.

- The Provider for any Shared Service and/or Shared Services System will review the allocated fixed and variable costs six months after commissioning is complete and no less than annually thereafter and will provide details of its review to the other Party. In addition, the Provider shall allow the Recipient and, subject to Section 14.7.1 of the Shared Services Systems Agreement, BP, reasonable access to the results of the review and the books and records maintained by Provider with respect to the Shared Services and/or Shared Services Systems for which it is the Provider in accordance with Section 4.1 and 5.8 of the Shared Services Systems Agreement. If the allocated fixed and variable costs determined following such review differ from the original

E-2

Exhibit 1

allocated fixed and variable costs, the amount of the difference shall be the subject of a True-Up Invoice in accordance with Section 10.1 of the Shared Services Systems Agreement.

- Upon the occurrence of a Major Event, solely with respect to any Shared Service, Shared Services System, Shared Authorization or Shared Premises affected by any such Major Event, the Fixed Cost Allocation for the fixed Shared Expenses below shall be updated to reflect the pro forma average usage of the service leading to such expense. For the avoidance of doubt, the Fixed Cost Allocation is intended to be set such that the Shared Expense allocated to each Party for a given Shared Service and/or Shared Services System does not exceed the cost such Party would have incurred if it had provided such Shared Service and/or Shared Service System for itself alone.

- For the avoidance of doubt, LBR shall bear all costs associated with the restart cost scope of work as defined in Appendix 2 of the Tolling Agreement including the restart of portions of the power plant, electrical transmission system, etc.

## II. Defined Allocation

| SHARED SERVICES | PROVIDER | FIXED COST ALLOCATION | COST ALLOCATION METHODOLOGY |
|---|---|---|---|
| **Personnel Cost** | Both | 70% LBR: 30% LBT | <ul><li>The fully loaded cost of any employee who works on the business of both Parties shall be allocated monthly between the Parties in proportion to the amount of time spent working for each. The allocation of time between the Parties may be accomplished via either time tracking or reasonable methods of estimation.</li><li>To the extent the Parties share any senior personnel and consider it impractical to utilize a system to track the allocation, the fully loaded costs of such officers shall be shared according to the Fixed Cost Allocation.</li></ul> |

**Exhibit 1**

| | | | |
|---|---|---|---|
| **Power Cost** | LBR | 80% LBR;<br>20% LBT | <ul><li>The Parties shall use commercially reasonable efforts to measure power usage by metering. To the extent metering (i) is not cost-effective or (ii) may be cost-effective but meters in connection therewith have not been installed at the time such service is provided, the Provider shall allocate power usage to the Recipient based on a commercially reasonable method of estimation, taking into account available data and consistently applied.</li><li>The Provider shall charge the Recipient for power in accordance with the following calculation:</li></ul>$P_C = [C_F \times H_R + VC] \times T_P + A_{FC} \times FC$<br><br>Where:<br><br>$P_C$ = Cost of power billed to the Recipient, $ per month<br><br>$C_F$ = Fuel cost, $ per MMBtu; determined pursuant to the Fuel Cost section below<br><br>$H$ = Heat rate, MMBtu/MWhr; initial value of 8.1; reflects fuel consumption and is net of steam production; to be trued up to reflect realized heat rate<br><br>$VC$ = Non-fuel variable cost of generating power, $/MWhr<br><br>$T_P$ = Terminal power usage of the Recipient, MWhr<br><br>$A_{FC}$ = Allocation of fixed cost to the Recipient, %; equal to the Fixed Cost Allocation<br><br>$FC$ = Total fixed cost of generating power, $ per month |

E-4

**Exhibit 1**

| | | | |
|---|---|---|---|
| **Fuel Cost** | LBR | N/A | • The Provider shall supply fuel to both itself and the Recipient. The Provider shall charge the Recipient for any fuel used directly by the Recipient in an amount equal to the fuel price as defined below multiplied by the fuel quantity. The price of fuel used for power generation ($C_f$) shall be the fuel price as defined below. All sales shall be adjusted to equivalent MMBtus.<br><br>• For any quantity of fuel imported to supply the Recipient, the fuel price shall be the equal to the actual delivered cost of imported fuel purchased at market price on an arms-length basis<br><br>• For any quantity of fuel supplied by LBR production, the fuel price shall be the cost of imported fuel at market price. To the extent that no fuel is imported or the cost of imported fuel is not representative of the market price, the cost of imported fuel shall be determined by the Provider based on broker quotes using a commercially reasonable methodology consistently applied.<br><br>Fuel use for dedicated terminal services such as fuel required for the truck rack flare or marine vapor combustion unit shall be metered where commercially reasonable.  The meters shall be provided and maintained by Recipient.  Both the Provider and the Recipient shall be allowed to witness and approve the installation, maintenance and proving of the meters. To the extent metering (i) is not cost-effective or (ii) may be cost-effective but meters in connection therewith have not been installed at the time such service is provided, the Provider shall allocate fuel usage to the Recipient based on a commercially reasonable method of estimation, taking into account available data and consistently applied. |
| **Wastewater Facility (Including Both Power and Non-power Expenses)** | LBR | 80% LBR; 20% LBT | • The fixed costs of the wastewater facility shall be allocated according to the Fixed Cost Allocation. The variable costs of the wastewater facility shall be allocated between the Parties based on factors including volume of water processed and hydrocarbon loading.<br><br>• LBT shall bear the wastewater facility variable cost related to metered usage by the HERT associated with the HERT's remediation efforts, which cost LBT charges back to the HERT. |

E-5

**Exhibit 1**

| Road Cost | LBT | 50% LBR; 50% LBT | • LBR shall be responsible for all maintenance costs associated with roads on the Refinery Site, and LBT shall be responsible for all maintenance costs associated with roads on the Terminal Site.<br>• Maintenance costs incurred for the shared roads shall, absent a Major Event, be allocated between the Parties according to the Fixed Cost Allocation.<br>• Any road that is a boundary between LBT and LBR property will be a shared road.<br>• Schedule 1 to this Exhibit E designates roads as Refinery, Terminal or shared roads. |
|---|---|---|---|
| Electrical Transmission Cost | Both | 80% LBR; 20% LBT | • LBR shall be responsible for all maintenance costs associated with electrical transmissions assets on the Refinery Site, and LBT shall be responsible for all maintenance costs associated with electrical transmissions assets on the Terminal Site.<br>• Schedule 2 to this Exhibit E lists certain feeders with shared ownership. Electrical transmission equipment that is downstream of shared feeders and required for delivery of power to load centers, including transformers, substations, and motor control centers, shall also be deemed shared systems. Schedule 2 to this Exhibit E shall be updated on or after the date of the Shared Services Systems Agreement in accordance with the second sentence of Section 14.9 of the Shared Services Systems Agreement to determine which of the feeders listed on Schedule 2 to this Exhibit E are shared feeders and which are utilized only by one of the Parties.<br>• For the shared transmission equipment, costs shall, absent a Major Event, be allocated between the Parties according to the Fixed Cost Allocation. |
| Stormwater Evacuation Cost | LBR | N/A | • Stormwater handling costs shall, absent a Major Event, be allocated based on the collection areas for sheet flow in each of the operating areas as shown in the attached plat plan. |

E-6

Exhibit 1

| Piping | Both | N/A | • LBR shall be responsible for all maintenance costs associated with pipe on the Refinery Site or pipe leading directly to/from Refinery process units and not otherwise used by LBT, and LBT shall be responsible for all maintenance costs associated with pipe on the Terminal Site except to such extent that LBR is responsible for the costs of such pipe.<br>• Any pipe projects executed by one Party on behalf of the other shall be allocated back at cost. |
|---|---|---|---|
| **Coke Domes, Coke Handling and Loading, Sulfur Loading** | LBR | 100% LBR; 0% LBT | • LBT shall spend up to $35 million refurbishing the coke and sulfur handling systems. LBR shall reimburse LBT for 100% of this cost plus a 13.5% cost of capital through a series of equal semi-annual payments over the five-year period following the Toll Start Date as defined in the Tolling Agreement.<br>• LBR may repay any outstanding balance of the coke and sulfur handling costs at any time prior to the end of the five-year repayment with no penalty / fees incurred as a result of early payment.<br>• LBR shall operate, maintain, and bear all ongoing costs associated with the coke domes, coke handling and loading, sulfur loading. |
| **Cottages** | LBT | N/A | • LBR shall lease up to 80 cottages in Estate Cottage and Estate Blessing from LBT and shall pay LBT rent of $3,900 per cottage per month.<br>• LBR shall also reimburse LBT for the actual operations and maintenance costs for the cottages it leases from LBT (including utilities and housekeeping). |

E-7

**Exhibit 1**

| | | | |
|---|---|---|---|
| **Limetree Village** | LBR | N/A | • Except to the extent LBT rents rooms in the man camp, LBR will bear 100% of all costs associated with the facility.<br><br>• LBT may utilize space in the Limetree Village if LBR has unutilized space available.<br><br>• LBT shall pay LBR rent for any Limetree Village rooms that it uses at a rate of $30 per room per night.<br><br>• LBT shall also reimburse LBR for the cost per room charged to LBR by the Limetree Village operator and all other costs of providing such room (including an allocation of operations and maintenance costs) as determined by LBR.<br><br>• If the facility is idle, LBT may restart and operate the facility and shall pay commercially reasonable rent per bed per night. In this case, LBT shall be responsible for the costs to operate and maintain the facility and shall be required to return the facility in in similar condition. |
| **Warehouse** | LBR | N/A | • Warehouse operating expenses (including employees) shall be allocated and billed to the Recipient according to the square footage in the warehouse used specifically by such Party.<br><br>• To the extent the Provider maintains an inventory of common parts also used by the Recipient and such parts are not immediately required by the Provider for its operations and, if agreed by the Provider, the Recipient shall have the option to purchase such parts from the Provider for use in its operations at cost plus 15%.<br><br>• To the extent reasonable, freight costs shall be allocated on a direct basis. Any freight costs for shared shipments shall be allocated based on the PO values of material shipped. |

US-DOCS\101520926.60

**Exhibit 1**

| | | | |
|---|---|---|---|
| **Laboratory** | LBR | 100% LBR; 0% LBT | <ul><li>To the extent there is additional space available beyond what is needed by the Provider and the Recipient requests use of such space, the Provider shall make such space available to the Recipient for use by such Party or such Party's designated third-party laboratory service.</li><li>The Recipient and/or the third-party shall reimburse the Provider for the pro-rata share of building operating and maintenance costs based on the percentage of square footage occupied.</li><li>The Provider shall charge the Recipient for any test it runs on the Recipient's behalf at cost based on a commercially reasonable allocation of the cost associated with such test.</li></ul> |
| **Compressed Air** | LBR | 100% LBR; 0% LBT | <ul><li>The Provider shall operate and maintain the plant air compressors. LBR shall bear 100% of the cost of owning, maintaining, and operating the compressed air units.</li><li>The Provider shall sell compressed air to the Recipient at a fixed price of $0.60 per 1000 scf.</li><li>The Provider shall allocate usage to the Recipient based on commercially reasonable estimated usage.</li></ul> |
| **Potable and Non-potable Water** | LBT | N/A | <ul><li>Each Party shall be allocated a share of the potable and non-potable water expenses monthly based on actual usage of each type of water.</li><li>The Parties shall use commercially reasonable efforts to meter usage of potable and non-potable water. To the extent metering (i) is not cost-effective or (ii) may be cost-effective but meters in connection therewith have not been installed at the time such service is provided, the Provider shall allocate potable and non-potable water usage to the Recipient based on a commercially reasonable method of estimation, taking into account available data and consistently applied.</li></ul> |

E-9

**Exhibit 1**

| Steam | LBR | 100% LBR; 0% LBT | <ul><li>LBR shall bear 100% of the costs to own, operate, and maintain the boilers and steam production.</li><li>To the extent the Provider is unable to use all the steam it produces, such steam shall be offered to the Recipient at no charge.</li><li>The Parties shall use commercially reasonable efforts to meter usage of steam. To the extent metering (i) is not cost-effective or (ii) may be cost-effective but meters in connection therewith have not been installed at the time such service is provided, the Provider shall allocate steam usage to the Recipient based on a commercially reasonable method of estimation, taking into account available data and consistently applied.</li><li>The Provider shall sell steam (except for unused excess steam) to the Recipient at a cost calculated as follows:</li></ul>$S_C = C_F \times [(S_{HP} \times 1.3) + (S_{MP} \times 1.2) + (S_{LP} \times 1.15)] + [(C_W \times Q_W) + C_M] \times [S_{HP} + S_{MP} + S_{LP}]$<br>Where:<br>$S$ = Monthly cost of steam billed to the Recipient<br>$C_F$ = Fuel cost, $ per MMBtu<br>$S_{HP}$ = High-pressure steam consumed by the Recipient, k lbs<br>$S_{MP}$ = Medium-pressure steam consumed by the Recipient, k lbs<br>$S_{LP}$ = Low-pressure steam consumed by the Recipient, k lbs<br>$C_W$ = Water cost, $ per gallon (initially from Seven Seas)<br>$Q_W$ = Water usage to produce steam, gallon per k lbs steam = 130 (permanent, deemed amount)<br>$C_M$ = Miscellaneous maintenance and operating cost allocations, $ per k lbs of steam; value of $1 per k lbs of steam |
|---|---|---|---|

US-DOCS\101520926.60

**Exhibit 1**

| | | | |
|---|---|---|---|
| **Nitrogen** | LBR | 100% LBR; 0% LBT | • LBR shall bear 100% of the cost of owning, operating, and maintaining the on-site nitrogen generation system.<br>• For any quantity of nitrogen imported to supply the Recipient, the price shall be the equal to the actual delivered cost of imported nitrogen purchased at market price on an arms-length basis<br>• For nitrogen supplied to the Recipient from the Provider's on-site generation system using available capacity not required by the Provider, the cost shall be $4.00 per 1000 scf. The Recipient shall provide any tube trailers required for its own transportation of $N_2$.<br>• The Recipient shall make reasonable commercial efforts to allow the Provider to utilize the Recipient's nitrogen tube trailer at no charge from time-to-time. The Parties shall use commercially reasonable efforts to meter usage of nitrogen. To the extent metering (i) is not cost-effective or (ii) may be cost-effective but meters in connection therewith have not been installed at the time such service is provided, the Provider shall allocate nitrogen usage to the Recipient based on a commercially reasonable method of estimation, taking into account available data and consistently applied. |
| **Contaminant Cleanup** | Both | N/A | • Disposal costs for hazardous waste spills or contamination shall be charged according to causation.<br>• Equipment costs in association with the spill or contamination shall be charged in accordance with the equipment provision below. |
| **OSRO (Spill Response)** | LBT | N/A | • The costs of any annual subscription fees for spill response shall be allocated to each of the Parties based on its pro rata share of the reasonably determined avoided cost of pursuing standalone coverage.<br>• Usage fees shall be charged for any OSRO requirements in accordance with causation. |

| | | | |
|---|---|---|---|
| **Insurance** | LBR | 80% LBR; 20% LBT | • For any insurance policies procured jointly, each Party shall be allocated a share of the insurance expense pursuant to the opinion of a third-party insurance broker in their sole discretion.<br><br>• Any common risk management personnel shall be allocated between the Parties according to the Fixed Cost Allocation. |
| **EHS** | LBR | 80% LBR; 20% LBT | • To the extent practical, each Party shall be responsible for the actual costs associated with ES&H compliance for its business. Shared EHS costs that are impractical to assign to a specific party shall be allocated according to the Fixed Cost Allocation. |
| **Training** | LBR | 80% LBR; 20% LBT | • To the extent practical, actual training costs shall be allocated the responsibility of the respective party. For costs that are impractical to sign to a specific party, costs shall be borne according to the Fixed Cost Allocation. |
| **Fire Safety/ Emergency Response** | LBR | 60% LBR; 40% LBT | • Shared fire safety/emergency response costs shall be allocated according to the Fixed Cost Allocation. |
| **Security** | LBT | N/A | Costs shall be allocated 50% based on site square footage occupied and 50% on the number of employee and contractors on site.<br><br>• Notwithstanding the allocation, 100% of the Limetree Village security costs shall be to the account of LBR (a share of which may be passed through to LBT for any Limetree Village beds it uses). |
| **Shared Software** | LBR | 80% LBR; 20% LBT | • Shared software costs that are billed on a "per seat" basis, each Party shall be allocated a portion the costs related to shared software licenses monthly based on the number of its employees who are users of such software. Shared employees shall be counted based on the percentage of their cost allocated to each Party (i.e., if a shared employee is allocated 80% to LBR and 20% to LBT, such employee shall count as 0.8 seat for LBR and 0.2 seat for LBT).<br><br>• For software that is shared but not billed on a "per seat" basis, costs shall be allocated between the Parties according to the Fixed Cost Allocation. |

CONFIDENTIAL
Bast Amron

US-DOCS\101520926.60

**Exhibit 1**

| Heavy Equipment and Vehicles | Both | 80% LBR; 20% LBT | • Each Party is responsible for the costs of its own vehicles.<br>• Costs of rental equipment shall be allocated based on usage. The expectation is that equipment shall be leased on a daily, weekly, monthly or other basis and charges shall be allocated based on usage tracked via work order or equipment hours.<br>• For shared usage where it is impractical to track actual usage, costs shall be allocated between the Parties according to the Fixed Cost Allocation.<br>• Each Party shall be responsible for the cost of any fuel it uses for heavy equipment, vehicles, and tugs pursuant to the Fuel Cost section above.<br>• LBT shall be responsible for the purchase of all fuel for the tugs. |
|---|---|---|---|
| Administration Building & Services | LBT | N/A | • Each Party shall be allocated costs associated with the administrative building and services provided therein based on the share of the administrative building square footage it occupies. |
| Other buildings | Both | N/A | LBR shall be responsible for operating other buildings on the Refinery Site, and LBT shall be responsible for operating other buildings on the Terminal Site.<br>The cost of any other buildings operated by one Party but used by the other Party shall be allocated based on the share of the building square footage it occupies. |
| Oily Solids | LBR | N/A | • LBR shall use commercially reasonable efforts to process oily solids from LBT operation at no charge to LBT. To the extent that processing of such oily solids requires LBR to incur incremental cost, the Parties will mutually agree on the amount that LBR charges to LBT for such processing, with such charge reasonably based on LBR's incremental cost associated with processing such oily solids. |

**Exhibit 1**

| | | | |
|---|---|---|---|
| **Firewater** | LBR | Various | • The costs to operate and maintain firewater assets shall be borne as follows:<br>   o Firewater pumps and intake system: 50% LBR:50% LBT<br>   o New express lines: 70% LBR:30% LBT<br>   o Any connection from the new express line to and within the Refinery Sites: 100% LBR<br>   o Any connection from the new express line to and within the Terminal Sites: 100% LBT<br>   o The shared portions of the Williams firewater system components (e.g. hoses, reels, pumpers, and other miscellaneous equipment): 50% LBR:50% LBT |
| **Emergency Response Equipment** | LBR | 60% LBR; 40% LBT | • The cost to operate and maintain emergency response equipment associated exclusively with the Terminal Site shall be borne by LBT.<br>• The cost to operate and maintain emergency response equipment associated exclusively with the Refinery Site shall be borne by LBR.<br>Any costs not exclusively for the Terminal Site or Refinery Site shall be shared between the Parties according to the Fixed Cost Allocation. |
| **Other Miscellaneous Shared Items** | Both | N/A | • The costs of operating other shared properties or shared services that are not yet Shared Services Systems or Shared Services in accordance with this Agreement and/or that are not otherwise referenced in this Exhibit E shall be shared as below:<br>• Fixed costs will be allocated based on whether either LBT or LBR require the service independently and, if the service is required by both Parties, based on pro forma average usage of the applicable service.<br>• Variable costs will be allocated on actual usage where commercially reasonable and estimated usage otherwise.<br>• If such shared properties or shared services systems are added as Shared Services Systems or Shared Services in accordance with this Agreement, the provisions of Section 2.4 and 6.1 shall apply |

E-14

Exhibit 1

**<u>Schedule 1 to Exhibit E</u>**

**Roads**

See attached.

**Exhibit 1**



Road Maintance
for Shared Services
Agreement
Legend
PINK = LBR
YELLOW = SHARED
No highlights = LBT
Rev 12Nov2018

**Exhibit 1**

**Schedule 2 to Exhibit E**

**Electrical Transmission Cost**

**Limetree Bay Feeders**
UTILITY #1
UTILITY #2
#2CDU, #1
#2 CDU, #2
#2 CDU, #3
#2 CDU, #4
LIMIT AMP
#1 VISBREAKER, #1
#1 VISBREAKER, #2
#3 DU
UOP, #1
UOP, #2
UOP, #3
ADMIN BUILDING
TANKFARM # 1
TANKFARM #2
FDR TO S/S #8
C-2301-C
LABORATORY
TANKFARM "A"
TANKFARM "B"
VAC/SULF, A&C
VAC/SULF, B&D
BTX - A, C, E
BTX - B, D, F
VACUUM #1
VACUUM #2
BTX #1
BTX #2
MANIFOLD #1
MANIFOLD #2
PHASE IV FDR #1
PHASE IV FDR #2
SCPC
SCPC
NO. 1 AUX XFM
NO. 2 AUX XFM
NO. 3 AUX XFM
AUX XFM 1105A
AUX XFM 1105B
FEEDER A TO SS #46
FEEDER B TO SS #46

E-16

Exhibit 1

5CDU
5CDU
5CDU
5CDU
6CDU
6CDU
6CDU
6CDU
VAC/SULF
VAC/SULF
VAC/SULF
VAC/SULF
SS 28,6,14,15,29
SS 28,6,14,15,29
SRU, SS 25-27
SRU, SS 25-27
DD #6&7
DD #6&7
DD #9, SS-24
DD #9, SS-24
DD #9, SS-24
DD #9, SS-24
DD #9, SS-24
DD #9, SS-24
FCC, SS-33
FCC, SS-33
FCC, SS-33
FCC, SS-33
SS-34
SS-34
SS-34
SS-34
SS-34
SS-34
SS-34
SS-34
SS-35
SS-35
SS-35
SS-35
SS-36
SS-36
SS-36
SS-36
BUS-Y (CD-7001)
BUS-Y (CD-7101B)

E-17

**Exhibit 1**

BUS-Y (CD-7101C)
NO. 4 AUX XFM
NO. 5 AUX XFM
NO. 6 AUX XFM
NO. 7 AUX XFM *
NO. 8 AUX XFM
NO. 9 AUX XFM
NO. 10 AUX XFM
P-7934A
P-7934B
P-7934C
P-7940A
P-7940B
COKER
COKER
COKER
COKER
VILLAGE

E-18

Exhibit 1